UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SONYA GLOVER,                                          Index No.: 15-cv-04899-MKB-LB

                            Plaintiff,

                  – against –                          **AMENDED COMPLAINT**

CITY OF NEW YORK, P.O. JOSEPH LAROSA, P.O.            **JURY TRIAL DEMANDED**
BRIAN LEGUERNIC, P.O. JOSEPH XERRI, SGT.
MATTHEW STARRANTINO, CAPT. JAMES KING,
DEPUTY INSPECTOR ANDREW LUNETTA,
ASSOCIATE INVESTIGATOR PATSY BREWSTER,
LT. PETER CALDERON, SGT. EUNICE
SHAFIDIYA, and JOHN DOES 1-14,

                            Defendants.

        Plaintiff Sonya Glover, by her attorney, Mark A. Marino, PC, for her Amended

Complaint against Defendants City of New York, P.O. Joseph Larosa, P.O. Brian Leguernic,

P.O. Joseph Xerri, Sgt. Matthew Starrantino, Capt. James King, Deputy Inspector Andrew

Lunetta, Associate Investigator Patsy Brewster, Lt. Peter Calderon, Sgt. Eunice Shafidiya, and

John Does 1-14, alleges as follows, upon personal knowledge and upon information and belief:

## NATURE OF THE ACTION

        1.      Plaintiff Sonya Glover ("Plaintiff"), a retired NYPD police officer, fulfilled a

long-time dream (and spent all of her savings) when she opened a bar in February 2012.  She

also obtained licenses as a private investigator and in the security field, which are lucrative fields

for ex-NYPD officers like Plaintiff who retire in good standing (and are thus allowed to carry a

concealed weapon).  Plaintiff planned to work in security and as a private investigator to

supplement her income from the bar.

2.      Plaintiff, an African-American, closed the bar after just one year, in approximately March 2013, after police officers from the NYPD's 110th Precinct engaged in a continuous pattern of conduct aimed at shutting the bar down – including raids from August 2012 through December 2012 – by targeting Plaintiff and her African-American patrons for the following reasons: (a) Plaintiff filed a lawsuit in 2010 against members of that precinct during her employment with the NYPD for which she was labeled, by many, as a "rat;" (b) members of that precinct were disciplined as a result of the allegations upon which that lawsuit was based; and (c) the bar was patronized primarily by African-Americans in a predominantly white and Hispanic neighborhood.

3.      Police officers from the 110th Precinct raided Plaintiff's bar four times in four months – from August 24, 2012 through December 14, 2012 – without cause or justification. During two particular incidents, police officers made statements indicating that Plaintiff is a "rat" and that she is litigious.

4.      Plaintiff reopened the bar in December 2013 for one day to throw a birthday party, yet even on that isolated occasion, police officers from the 110th Precinct raided the bar with no cause or justification.  The officers thought they had closed the bar down for good (and they were right, of course).

5.      Plaintiff received bogus summonses on September 29, 2012 and December 14, 2012.  On September 29, 2012, Plaintiff was also "put through the system" – fingerprinted, photographed, sent to central booking, etc. – in contravention of police policy/protocol and in retaliation for her 2010 lawsuit and owning a bar patronized primarily by African-Americans in a white and Hispanic neighborhood.

6.      After Plaintiff was put through the system, the NYPD's Pistol Licensing Division required Plaintiff to turn in her gun and suspended her license to carry a concealed weapon, which crippled her prospects as a private investigator and in the security field.  Although the charges against Plaintiff were dismissed in January 2014, the NYPD's Pistol Licensing Division still refuses to return her gun – it is her property, not NYPD-issued – or reinstate her permit to carry a concealed firearm.  This behavior was also taken in retaliation for Plaintiff's lawsuit (and for other incidents occurring) during her employment with the NYPD.

7.      Plaintiff brings claims against various (past and present) members of the NYPD, and Defendant City of New York for various violations of 42 U.S.C. 1983 and the Fourth and Fourteenth Amendments to the Constitution.

8.      As a result of the incidents set forth above and further detailed below, Plaintiff sustained serious injuries, including, but not limited to, psychological injuries, severe emotional distress, monetary damages, lost past wages, lost future earnings, legal expenses, property loss, loss of freedom/time in confinement, and past and future medical expenses (for psychiatric visits), among other things, all of which were caused by the actions of each of the defendants. (These injuries, along with any additional injuries alleged herein, are hereinafter referred to, collectively, as the "Injuries.")

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction over the instant action, pursuant to 28 U.S.C. §§ 1331 and 1343, as this is a civil action asserting claims under the federal civil rights laws.

10.     Venue is proper, pursuant to 28 U.S.C. § 1391, as a substantial part of the events giving rise to the claim occurred within this District and one or more of Defendants reside in this District (and all Defendants reside in the State of New York).

## PARTIES

11.     Plaintiff is, and was during the incidents giving rise to this action, a resident of the County of Queens, State of New York.

12.     Defendant City of New York is, and was during the incidents giving rise to this action, a municipal corporation duly organized under, and existing by virtue of, the laws of the State of New York.  Defendant City of New York has contacts within this District which would be sufficient to subject it to personal jurisdiction if the District were a separate state.

13.     Defendant P.O. Joseph Larosa was, during the incidents giving rise to this action, a police officer with the NYPD, an agency of Defendant City of New York, stationed at the NYPD's 110th Precinct with Tax ID No. 944104 ("Larosa").  The NYPD's 110th Precinct is located within this District.

14.     Defendant Larosa was, during the incidents giving rise to this action, acting within the scope of employment with the NYPD and thus Defendant City of New York.

15.     Defendant Larosa was, during the incidents giving rise to this action, acting under color of state law.

16.     Defendant P.O. Brian Leguernic is, and was during the incidents giving rise to this action, a police officer with the NYPD, an agency of Defendant City of New York, stationed at the NYPD's 110th Precinct with Tax ID No. 943474 ("Leguernic").  The NYPD's 110th Precinct is located within this District.

17.     Defendant Leguernic was, during the incidents giving rise to this action, acting within the scope of employment with the NYPD and thus Defendant City of New York.

18.     Defendant Leguernic was, during the incidents giving rise to this action, acting under color of state law.

19.     Defendant P.O. Joseph Xerri is, and was during the incidents giving rise to this action, a police officer with the NYPD, an agency of Defendant City of New York, stationed at the NYPD's 110th Precinct with Tax ID No. 939721 ("Xerri").  The NYPD's 110th Precinct is located within this District.

20.     Defendant Xerri was, during the incidents giving rise to this action, acting within the scope of employment with the NYPD and thus Defendant City of New York.

21.     Defendant Xerri was, during the incidents giving rise to this action, acting under color of state law.

22.     Defendant Sgt. Matthew Starrantino was, during the incidents giving rise to this action, a sergeant with the NYPD, an agency of Defendant City of New York, stationed at the NYPD's 110th Precinct with Tax ID No. 929211 ("Starrantino").  The NYPD's 110th Precinct is located within this District.

23.     Defendant Starrantino was, during the incidents giving rise to this action, acting within the scope of employment with the NYPD and thus Defendant City of New York.

24.     Defendant Starrantino was, during the incidents giving rise to this action, acting under color of state law.

25.     Defendant Capt. James King was, during the incidents giving rise to this action, a lieutenant (upon information and belief) with the NYPD, an agency of Defendant City of New York, stationed at the NYPD's 110th Precinct ("King").  The NYPD's 110th Precinct is located within this District.

26.     Defendant King was, during the incidents giving rise to this action, acting within the scope of employment with the NYPD and thus Defendant City of New York.

27.     Defendant King was, during the incidents giving rise to this action, acting under color of state law.

28.     Defendant Deputy Inspector Andrew Lunetta was, during the incidents giving rise to this action, an employee with the Pistol Licensing Division of the NYPD, an agency of Defendant City of New York ("Lunetta").

29.     Defendant Lunetta was, during the incidents giving rise to this action, acting within the scope of employment with the NYPD and thus Defendant City of New York.

30.     Defendant Lunetta was, during the incidents giving rise to this action, acting under color of state law.

31.     Defendant Associate Investigator Patsy Brewster was, during the incidents giving rise to this action, an employee with the Pistol Licensing Division of the NYPD, an agency of Defendant City of New York ("Brewster").

32.     Defendant Brewster was, during the incidents giving rise to this action, acting within the scope of employment with the NYPD and thus Defendant City of New York.

33.     Defendant Brewster was, during the incidents giving rise to this action, acting under color of state law.

34.     Defendant Lt. Peter Calderon was, during the incidents giving rise to this action, a lieutenant with the NYPD, an agency of Defendant City of New York ("Calderon").

35.     Defendant Calderon was, during the incidents giving rise to this action, acting within the scope of employment with the NYPD and thus Defendant City of New York.

36.     Defendant Calderon was, during the incidents giving rise to this action, acting under color of state law.

37.     Defendant Sgt. Eunice Shafidiya was, during the incidents giving rise to this action, a sergeant with the NYPD, an agency of Defendant City of New York, stationed at the NYPD's 110th Precinct ("Shafidiya").  Defendant Shafidiya was at the Bar on several occasions in 2012 doing routine checks.  The NYPD's 110th Precinct is located within this District.

38.     Defendant Shafidiya was, during the incidents giving rise to this action, acting within the scope of employment with the NYPD and thus Defendant City of New York.

39.     Defendant Shafidiya was, during the incidents giving rise to this action, acting under color of state law.

40.     Defendant John Does 1-14 were, during the incidents giving rise to this action, employees of the NYPD, an agency of Defendant City of New York (collectively, "John Does").

41.     Defendant John Does were, during the incidents giving rise to this action, acting within the scope of employment with the NYPD and thus Defendant City of New York.

42.     Defendant John Does were, during the incidents giving rise to this action, acting under color of state law.

43.     The names of Defendant John Does will become apparent during discovery.

44.     Defendant John Doe 1 was, during the incidents giving rise to this action, a member of the NYPD with a rank higher than sergeant.  Prior to the December 22, 2013 raid on the Bar, described below, Defendant John Doe 1 told Defendant Shafidiya to shut the Bar down.  The name of Defendant John Doe 1 will become apparent during discovery.

45.     Defendant Larosa, Defendant Leguernic, Defendant Xerri, Defendant Starrantino, Defendant King, Defendant Calderon, Defendant Shafidiya, and certain of Defendant John Does (including Defendant John Doe 1) are hereinafter referred to, collectively, as the "Police Officer Defendants."

46.     Defendant Lunetta, Defendant Brewster, and certain of Defendant John Does are hereinafter referred to, collectively, as the "Gun Licensing Defendants."

47.     Defendant City of New York, Defendant John Does, the Police Officer Defendants, and the Gun Licensing Defendants are hereinafter referred to, collectively, as "Defendants."

## FACTUAL ALLEGATIONS

48.     Plaintiff is an African-American female.

49.     Plaintiff began working as an NYPD police officer in April 1991.

50.     On or about April 22, 2001, Plaintiff wade serious waves when she stopped a group of police officers from brutally beating a handcuffed African-American man in custody. For this, Plaintiff was labeled a "rat," which followed her throughout the final ten years of her career.  The lieutenant and sergeant involved in the beating tried to bring charges against Plaintiff for "cowardliness," but those charges went nowhere; in fact, those two officers were charged and disciplined.

51.     In 2004, Plaintiff filed a lawsuit alleging racial discrimination, among other things.  Plaintiff was one of many police officer plaintiffs in that action.

52.     In May 2005, Plaintiff filed an internal complaint with the Office of Equal Employment Opportunity against another police officer for gender discrimination.

53.     In January 2007, Plaintiff filed suit against NYPD officials in New York Supreme Court, alleging retaliation and discrimination based on race, sex, and sexual orientation.

54.     Plaintiff was subject to further discriminatory conduct for the next three years, including, but not limited to, the following: a transfer to a different position to clean bathrooms; denials of overtime pay; unwarranted accusations resulting in formal violations; and trumped up

(and well-publicized) domestic violence charges against her.  The domestic violence charges, which arose out of false allegations by officers in the 110th Precinct, were ultimately dismissed in the NYPD's administrative court.  These officers were disciplined.

55.     In February 2010, Plaintiff filed a discrimination lawsuit against, among others, P.O. Carlo Cifarelli and P.O. Owen DeSouza – the police officers from the NYPD's 110th Precinct who trumped up the aforementioned domestic violence charges.

56.     Plaintiff's lawsuit settled in June 2010.

57.     Plaintiff retired from the NYPD in April 2011, in good standing, after twenty years of service.

58.     Upon retiring from the NYPD in good standing, Plaintiff had a permit to own a firearm.

59.     Upon retiring from the NYPD in good standing, Plaintiff had a permit to carry a concealed firearm.

60.     A retired NYPD police officer with a permit to carry a concealed weapon can easily find employment (and good pay) in the security field.  In fact, a substantial amount of retired NYPD officers obtain employment in the security field.

61.     Employment in the security field for a retired NYPD police officer with a permit to carry a concealed weapon pays between $35 and $65 per hour.  Without a permit, the pay ranges from $18 to $20 per hour.

62.     At the time Plaintiff retired, in good standing with her firearm and license to carry a concealed weapon, she planned to pursue employment in the security field.  In fact, Plaintiff completed the necessary paperwork and took the necessary steps (including required testing) to become licensed to perform security.  Plaintiff received a New York State license in security.

63.     A substantial amount of retired NYPD officers obtain employment as private investigators.  Employment for a private investigator is hindered greatly if the investigator is not allowed to carry a concealed weapon.

64.     At the time Plaintiff retired, in good standing with her firearm and license to carry a concealed weapon, she planned to pursue employment as a private investigator.  In fact, Plaintiff had completed the necessary paperwork and took the necessary steps (including required testing) to become a licensed private investigator.  Plaintiff received a New York State license as a private investigator.

65.     At the time she retired, Plaintiff completed the necessary paperwork to acquire a liquor license (and any other licenses or permits) to open a bar.  Plaintiff received a New York State liquor license.

66.     On or about February 2012, Plaintiff opened the Onyxx Lounge (the "Bar").

67.     Plaintiff put all of her savings into opening the Bar.

68.     The Bar was located in the middle of the NYPD's 110th Precinct.

69.     The Bar was patronized primarily by African-Americans.

70.     Upon information and belief, the Bar was the only bar in the 110th Precinct patronized primarily by African-Americans at that time.

71.     The 110th Precinct is notorious for its poor race relations.  In fact, according to a NYCLU study of stop-and-frisks in 2012, "[t]he precinct with the highest frisk rate was the 110th Precinct in Queens, where 81.4 percent of stops had frisks…."  According to the same study, the 110th Precinct ranked 6th (out of approximately 75 precincts) in the number of times force was used during a stop-and-frisk (2,389 times total).  See *NYCLU 2012 Stop-and-Frisk Briefing*, http://www.nyclu.org/files/publications/2012_Report_NYCLU_0.pdf.

72.     During all times relevant to this lawsuit, there were other bars in the 110th
Precinct.  All of the other bars in the 110th Precinct were, by and large, owned and patronized by
whites and Hispanics – not African-Americans.

73.     Other bars (and bar owners) in the 110th Precinct were not subject to police raids
(without a warrant) during all times relevant to this lawsuit.  This includes, but is not limited to,
searches allegedly pursuant to New York's Alcohol Beverage Control Laws (the "ABC Laws").

74.     During all times relevant to this lawsuit, there were other businesses (other than
bars) in the 110th Precinct.  All of the other businesses in the 110th Precinct were, by and large,
owned and patronized by whites and Hispanics – not African-Americans.

75.     Other businesses (and business owners) were not subject to police raids (without a
warrant) during all times relevant to this lawsuit.  This includes, but is not limited to, searches
allegedly pursuant to the ABC Laws.

76.     The Bar was conspicuously open six days a week from 4:00 p.m. to 4:00 a.m.

77.     Plaintiff had all necessary certificates and licenses present in the Bar.

78.     All of the Bar's necessary certificates and licenses were posted behind the bar (or
its files under the bar) in accordance with the ABC Laws.

79.     The Bar began to gain popularity leading into the summer of 2012.

80.     The Bar was becoming profitable leading into the summer of 2012.  The Bar was
getting traction.

81.     Neither Plaintiff nor anyone from the Bar ever called the police at any time for
any reason.  There was never any problem, altercation, or the like at the Bar requiring police
intervention.

82.     The police suddenly began making their presence known in July 2012 by standing outside the Bar, circling around the block in patrol cars, and conducting stop-and-frisks on patrons (mainly African-American males).  This was done in an effort to slow Plaintiff's business down (and eventually shut the Bar down).

83.     The Bar had continuing success throughout the summer of 2012.  Plaintiff was deriving more income from the Bar at this time.  The Bar was gaining momentum.

**The August 24, 2012 Raid**

84.     On Friday, August 24, 2012, approximately five police officers raided the Bar at night during a party without cause or justification (or warrant of any kind).

85.     While one sergeant looked at Plaintiff's liquor license, business license, and certificate of occupancy, the other four police officers spread out and walked through the Bar to intimidate patrons.  The Bar was not very large, so the presence of four police officers had patrons backed into corners.

86.     The police officers did not announce the reason for the raid.

87.     The police officers came into the Bar at 9:00 p.m.

88.     The Bar was full of patrons for the party.  The lights were low and the music was at a moderate level.

89.     After the raid, two officers stayed back in a patrol car and got out periodically to harass patrons.

90.     The police officers were conducting the search as a pretext in order to rummage through the Bar in hopes of discovering incriminating evidence against Plaintiff and her African-American patrons.

91.     The police officers were conducting the search as a pretext in order to rummage through the Bar to harass Plaintiff and her African-American patrons.

92.     The police officers were conducting the search in bad faith and in order to damage Plaintiff's business.

93.     The search did not comply with the NYPD's procedure regarding administrative (or otherwise warrantless) searches.

**The August 27, 2012 Raid**

94.     Just three days later, on Monday, August 27, 2012, Plaintiff held a private party for a friend of a family member.

95.     Plaintiff did not often have events at the Bar on Mondays.

96.     That night, approximately seven police officers came into the Bar without cause or justification.  One of the officers told Plaintiff, who was behind the bar, to turn the lights on and commanded the DJ to turn the music off.  Interestingly, that night was close to the end of the month (and thus near the time for police officers to make their monthly quotas).

97.     Just like the incident on August 24, 2012, Defendant Shafidiya looked at Plaintiff's liquor license, business license, and certificate of occupancy, while six other police officers posted themselves throughout the Bar to intimidate patrons.  Patrons began to leave.

98.     The police officers did not announce the reason for the raid.

99.     One of these police officers was an Asian male standing between 5'9" and 6'2" tall.

100.     One African-American male was arrested waiting for a taxi, and officers conducted stop-and-frisks on several other patrons against a brick wall outside the Bar.

101.    The police officers were conducting the search as a pretext in order to rummage through the Bar in hopes of discovering incriminating evidence against Plaintiff and her African-American patrons.

102.    The police officers were conducting the search as a pretext in order to rummage through the Bar to harass Plaintiff and her African-American patrons.

103.    The police officers were conducting the searches in bad faith and in order to damage Plaintiff's business.

104.    The search did not comply with the NYPD's procedure regarding administrative (or otherwise warrantless) searches.

### The September 28-29, 2012 Raid

105.    On September 28-29, 2012, Plaintiff was hosting an event for musicians and musical artists at the Bar.

106.    Plaintiff had a contract and ongoing business relationship with the host of the party.

107.    At approximately 10:00 p.m. on September 28, 2012, Defendant Larosa (who was accompanied by another of the Police Officer Defendants) showed up outside the Bar and began conducting stop-and-frisks of African-American males with no reasonable suspicion (and using excessive force in the process).

108.    Plaintiff came outside and identified herself as a former officer, and showed her NYPD identification card (which contains her name).  The officers told Plaintiff that they were responding to a radio call for public urination, but that was a pretense, as that call was for another location.  When Plaintiff protested the illegal stop-and-frisks and excessive force, Defendant Larosa stated: "I'll be back."

109.     About an hour later, Defendant Larosa made good on his promise to come back and brought a crew of officers who were supposed to be patrolling the other sectors in the 110th Precinct (in a coordinated effort).

110.     This group, including Defendant Larosa, Defendant Leguernic, Defendant Starrantino, and the Police Officer Defendants, pulled up in approximately three marked cars, approximately two unmarked cars, and one police van.

111.     There were so many officers at the Bar that the dispatcher was calling for help in other sectors – asking the officers to respond to crimes in progress in other parts of the precinct – but got no response because they were too busy harassing Plaintiff and disrupting the party.

112.     Right when the officers arrived at the scene on September 29, 2012, Defendant Larosa stated (very clearly): "There she is.  There's that bitch right there."  Defendant Larosa meant Plaintiff.

113.     Plaintiff was in the doorway to ask why they were at the Bar when Defendant Starrantino aggressively approached Plaintiff and asked to see her license.  Plaintiff had no choice but to agree and open the door, and even then, Defendant Starrantino used force to push Plaintiff out the way.

114.     Defendant Starrantino turned to the DJ, stating: "Turn this shit off."  He meant the music.

115.     One of the eight police officers who raided the Bar turned to the patrons and stated: "The party's over.  Get the fuck out."  The other officers were telling the patrons to leave but in less colorful language.  They completely shut down the party.

116.     One of the police officers ripped Plaintiff's liquor license off the wall.

117.     One of the police officers broke the door to the basement of the Bar.

118.    One or more of the police officers took five thousand dollars ($5000.00) from the basement.

119.    Defendant Larosa and Defendant Leguernic issued Plaintiff a total of nine bogus summonses – basically, tickets.

120.    Defendant Larosa and Defendant Leguernic issued these summonses at the direction of Defendant Starrantino.

121.    The summonses were incorrectly issued to Plaintiff, personally, instead of the Bar.

122.    Defendant Larosa issued five of the summonses, while Defendant Leguernic issued four of the summonses – a practice known as "splitting summonses."

123.    NYPD police personnel split summonses so they can meet their target numbers for the month.  Not coincidentally, the summonses were issued on the second-to-last day of the month, September 29, 2012.

124.    Defendant Larosa and Defendant Leguernic split the summonses so one or both of them could issue enough summonses before the end of September to meet their quotas.

125.    Defendant Larosa and Defendant Leguernic did not have probable cause to issue Plaintiff any of the aforementioned summonses.

126.    Defendant Larosa and Defendant Leguernic did not have probable cause to arrest Plaintiff.

127.    Plaintiff was handcuffed/arrested at the Bar at approximately 1:30 a.m. and taken to the 110th Precinct, where she saw Defendant King (at the desk).

128.    Defendant King ascertained that she was a former officer with strained relations with the 110th Precinct – to put it mildly.  Plaintiff recalls that Defendant King stated that he

knew who she was and added the following (while pointing to his badge and showing it to Plaintiff): "I know what you're going to do.  You're going to be a rat bitch and you're going to make a CCRB complaint.  Get her the hell away from me."

129.    Defendant King ordered Defendant Larosa to arrest Plaintiff and put her through the system, although she had already been given a summons.  This was an illegal "re-arrest" – charging Plaintiff with a crime via summons and then charging her again with the same crime and sending her to central booking for the night to be charged the following day.  The others with whom Plaintiff was arrested were not put through the system.

130.    Defendant King gave these orders in retaliation for Plaintiff's prior lawsuit against police officers from that precinct (among other complaints/protected activities made by Plaintiff) and the disciplinary actions taken against the members of the 110th Precinct who provided some of the basis for that lawsuit.

131.    Defendant King, then a lieutenant, knew that this type of arrest – fingerprinting, photographing, etc. – would jeopardize Plaintiff's license to carry a concealed weapon (and thus substantially affect any chance of her getting a high paying job in security or as a private investigator).

132.    Plaintiff was never read her Miranda rights.

133.    Plaintiff was never given a phone call, even though she asked for one.

134.    Plaintiff was arraigned at approximately 4:30 p.m. on September 29, 2012.

135.    The Bar steadily lost business – including repeat business – as a result of continued harassment by the NYPD (and especially the scene created on September 28-29, 2012).  Plaintiff's income dropped as well.

## The December 14, 2012 Raid

136.    Less than three months later, on Friday, December 14, 2012, certain of the Police Officer Defendants put together a special operation to raid the Bar – in this case, a "detail," which consists of a team of officers including a ranking supervisor (lieutenant or above), a sergeant, and eight police officers (all in plainclothes).  Like virtually every detail, this one was planned in advance.  Defendant Larosa, Defendant Starrantino, Defendant Xerri, and Defendant Calderon were present during the raid.  Defendant Calderon was not a member of the 110th Precinct.

137.    Plaintiff, an NYPD police officer for 20 years, told the ranking supervisor, Defendant Calderon: "This is a raid."

138.    Defendant Calderon responded: "I can tell them it's an ABC check and it'll work for me."  Defendant Calderon was referring to a search under the ABC Laws.

139.    Upon information and belief, the Police Officer Defendants conducted their raids under the pretext of the ABC Laws.

140.    Upon information and belief, the Police Officer Defendants felt as if the ABC Laws provided them with the right to raid any bar, at any time, for any reason (pretextual or not).

141.    When Plaintiff questioned the motives of members of the precinct whose members she had sued just two years earlier, Defendant Starrantino told Plaintiff: "I'll slap the shit out of you and lock your black ass up like I did last time."

142.    One of the officers told Plaintiff that "they knew all about her," that she's a rat, and that she likes to sue.

143.    At the direction of Defendant Calderon and Defendant Starrantino, Defendant Xerri issued a series of bogus summonses to Plaintiff on December 14, 2012.

144.    The Police Officer Defendants conducted four raids in four months – on August 24, August 27, September 28-29, and December 14.  The period of time between the raids on September 28-29 and December 14 was interrupted by Hurricane Sandy, which hit on or about October 29, 2012.  The Bar was shut down for most (or all) of November 2012, so there were no opportunities to raid it.

145.    Shortly after the December 14, 2012 raid, the Assistant District Attorney assigned to Plaintiff's criminal case (as African-American female) called the 110th Precinct and told a high-ranking officer that certain of the Police Officer Defendants – upon information and belief, Defendant Larosa and Defendant Starrantino, among others – should stay away from the Bar.

146.    Members of the 110th Precinct did not raid the Bar in the following months, but they maintained an excessive presence around the Bar.  The Bar was closed within three months.

### The December 22, 2013 Raid

147.    Even though Plaintiff had closed the Bar in early 2013, she still had access to it.

148.    Plaintiff reopened the Bar on or about December 22, 2013, for one evening/night only, to host a birthday party.

149.    During the party, approximately ten officers from the NYPD's 110th Precinct entered the Bar without a warrant or any justification.

150.    One of the officers demanded lights to be turned on and the music turned off.

151.    Certain officers began picking up patrons' drinks and putting them up to their noses to smell them and requesting ID.

152.    When patrons protested, they were frisked, shoved, and told to leave before they were arrested.

153.    The NYPD sergeant running the raid, Defendant Shafidiya, was an African-American female, which is not a coincidence.

154.    According to Defendant Shafidiya, certain NYPD personnel at the 110th Precinct sent the officers to the Bar because they thought they had shut it down.

155.    Defendant Shafidiya told Plaintiff that Defendant John Doe 1 had told her to "shut the Bar down."  Upon information and belief, Defendant John Doe 1 was Defendant King.

156.    During the raid, an NYPD police officer grabbed a patron's drink, and after the patron got upset, dumped the drink out on the bar.

157.    All criminal charges against Plaintiff were dismissed in January 2014.  Plaintiff made approximately seven appearances in criminal court and incurred attorney's fees defending herself against these baseless charges.

**The NYPD Confiscated Plaintiff's Firearm and Cancelled Her License**

158.    Plaintiff received a letter from Defendant Lunetta (and the NYPD's Pistol Licensing Division), dated October 12, 2012, demanding that she turn in her gun to the NYPD after her arrest.

159.    Defendant Lunetta's October 12, 2012 letter also informed Plaintiff that her license to carry a concealed weapon was suspended and that Defendant Brewster would be in charge of the investigation into the restoration of Plaintiff's gun license and carrying permit.

160.    On October 27, 2012, Plaintiff complied with Defendant Lunetta's demand and turned in her gun to the NYPD.

161.    In January 2014, Plaintiff was exonerated of all charges from the September 29, 2012 and December 14, 2012 police raids.

162.     Plaintiff immediately began her attempt to get her license and firearm from the NYPD.  She brought a copy of the Court's decision directly to Defendant Brewster, who made a copy for her file.

163.     In June 2014, Plaintiff finally received a response from Defendant Lunetta stating that her license to carry a concealed weapon would be suspended until July 29, 2014, and she should complete a renewal application for the return of the gun and return of the license.

164.     Plaintiff completed the renewal application for the return of her gun and license in July 2014, in accordance with Defendant Lunetta's instructions, and returned it to his office (in person) to "Ms. Hussein."  Plaintiff assumed that she would receive her gun and license shortly.

165.     When Plaintiff brought the completed renewal form back as instructed, however, Ms. Hussein backpedaled and told Plaintiff that she should wait for Defendant Brewster to contact her.

166.     Plaintiff never received her gun or license, so she made visits to NYPD Headquarters in August 2014, October 2014, November 2014, December 2014, and January 2015.

167.     In January 2015, Plaintiff was told by a sergeant that the NYPD had cancelled her license to carry a concealed firearm because they never received the renewal application Plaintiff completed (and hand delivered) in July 2014.  The sergeant told her to write a letter detailing what she had done to get her license back.  Plaintiff wrote this letter but has never heard back from the NYPD.

168.     In April 2015, Plaintiff went back to get an update but was told by the same sergeant that the NYPD will not return her firearm.

169.     Plaintiff's firearm has been in NYPD custody since October 27, 2012.

170. The NYPD seized Plaintiff's firearm because she was arrested on September 29, 2012.

171. The NYPD, through the Gun Licensing Defendants, kept Plaintiff's firearm in retaliation for filing a lawsuit against the NYPD before retiring.

172. The NYPD, through the Gun Licensing Defendants, seized Plaintiff's firearm because of her September 29, 2012 (false) arrest.

173. The NYPD, through the Gun Licensing Defendants, cancelled Plaintiff's permit to own a gun.

174. The NYPD, through the Gun Licensing Defendants, cancelled Plaintiff's permit to carry a concealed weapon.

175. The NYPD, through the Gun Licensing Defendants, refuses to reinstate Plaintiff's permit to carry a concealed weapon because she filed a lawsuit against the NYPD.

176. The NYPD, through the Gun Licensing Defendants, refused to process Plaintiff's renewal application because she filed a lawsuit (and engaged in other protected activities) against the NYPD.

177. Plaintiff was never afforded the opportunity to get a high-paying job in security paying unless she obtains a permit to own a gun (and carry a concealed weapon) at the appropriate time.

178. Plaintiff will never have the opportunity to get a high-paying job in security paying because she will never gain her a permit to own a gun (and carry a concealed weapon).

179. Plaintiff, who began a 20-year career as a police officer at the age of twenty-two, is unfortunately not as suited for employment – at least not in as many fields – as many job seekers.

180.    Plaintiff has attempted to find suitable employment since turning in her weapon.

181.    Plaintiff has not been able to find suitable employment since turning in her weapon.

182.    Plaintiff has endured psychological injuries from Defendants' conduct for over two years.

183.    Plaintiff has undergone treatment for her psychological injuries, which were caused by Defendants' conduct, during the past two years.

184.    The actions set forth in this claim for relief are, and were, the proximate cause of the Injuries (as defined above), including (but certainly not limited to) the financial ruin of the Bar, the confiscation of Plaintiff's gun and license to carry a firearm, and Plaintiff's inability to work effectively in security and as a private investigator – that is, lost earnings – because of the confiscation of Plaintiff's firearm and license to carry a firearm.

185.    The actions of the Gun Licensing Defendants are, and were, the proximate cause of the Injuries (as defined above), including (but certainly not limited to) the confiscation of Plaintiff's gun and license to carry a firearm, and Plaintiff's inability to work effectively in security and as a private investigator – that is, lost earnings – because of the confiscation of Plaintiff's firearm and license to carry a firearm.

186.    On October 17, 2012, Plaintiff filed a Notice of Claim with Defendant City of New York containing many of the allegations contained herein.

187.    On December 26, 2013, Plaintiff filed a lawsuit in Queens County Supreme Court, containing many of the allegations contained herein, and Defendant City of New York filed its answer on or about September 23, 2014.

188.    The Office of Corporation Counsel represented all of the defendants named in that action, including Defendant City of New York, Defendant Larosa, Defendant Leguernic, Defendant Starrantino, and Defendant King.

189.    On June 5, 2015, Plaintiff entered into a stipulation with Corporation Counsel, on behalf of all of the defendants, to discontinue the aforementioned action with the express "inten[sion] to refile the asserted causes of action, among others, in the United States District Court for either the Eastern District of New York or Southern District of New York."  That stipulation was filed in Queens County Supreme Court.

190.    Plaintiff demands a trial by jury.

### FIRST CLAIM FOR RELIEF
**VIOLATION OF 42 U.S.C. § 2000e, *ET SEQ*. – RETALIATION**
**As Against the Police Officer Defendants and the Gun Licensing Defendants**

191.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 190, inclusive, as though fully set forth herein.

192.    Under the Fourteenth Amendment of the Constitution of the United States of America and 42 U.S.C. § 2000, Plaintiff has the right to be free from retaliatory actions from employers and former employers.

193.    Plaintiff first drew the ire of police officials when she stopped a group of police officers from brutally beating a handcuffed African-American man in custody in NYPD precinct PSA 3 – thus, becoming a "rat" – while employed by the NYPD (and thus Defendant City of New York).

194.    Plaintiff engaged in protected activities while employed by the NYPD, and thus Defendant City of New York, including filing several internal complaints with the NYPD and lawsuits in state and federal court in 2004, 2007, and 2010.

195.    The final lawsuit, in part, was against members of the 110th Precinct for off color jokes about lesbians, refusal to conduct an investigation, and filing a false report, among other things.  That lawsuit was filed while Plaintiff was employed by the NYPD, and thus Defendant City of New York.

196.    The Police Officer Defendants were aware of Plaintiff's participation in one or more of these protected activities, including, but not limited to, the lawsuit filed in 2010 alleging race, sex, and sexual orientation discrimination against members of the NYPD's 110th Precinct, among others.

197.    The Police Officer Defendants, all members of the 110th Precinct, took adverse actions against Plaintiff in the form of harassing patrons, conducting four raids, issuing bogus summonses (to Plaintiff instead of the Bar), re-arresting and putting Plaintiff through the system, taking Plaintiff's gun, taking Plaintiff's gun license, and not returning the gun or license even though the charges were dropped.

198.    The series and pattern of adverse actions taken by the Police Officer Defendants began just a few months after Plaintiff opened the Bar in the NYPD's 110th Precinct – the same precinct at which two of the defendants in Plaintiff's 2010 lawsuit were stationed.

199.    The actionable adverse actions continued when the Gun License Defendants realized Plaintiff's history as an NYPD police officer.

200.    The actionable adverse actions continued when the Gun License Defendants realized Plaintiff's role as a litigant against Defendant City of New York arising out of allegations against the NYPD (while Plaintiff was employed by the NYPD).

201.    The Gun License Defendants took Plaintiff's gun and will not return it.

202.    The Gun License Defendants cancelled Plaintiff's gun license and will not reinstate it.

203.    A causal connection existed between the protected activities and the adverse actions and the Injuries.

204.    The actions set forth in this claim for relief, which were taken by the defendants named in this claim for relief, are, and were, the proximate cause of the Injuries (as defined above), including (but certainly not limited to) the financial ruin of the Bar, the confiscation of Plaintiff's gun and license to carry a firearm, and Plaintiff's inability to work effectively in security and as a private investigator – that is, lost earnings – because of the confiscation of Plaintiff's firearm and license to carry a firearm.

<u>SECOND CLAIM FOR RELIEF</u>
**VIOLATION OF 42 U.S.C. 1983 AND EQUAL PROTECTION CLAUSE**
**As Against the Police Officer Defendants**

205.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 204, inclusive, as though fully set forth herein.

206.    The Equal Protection Clause of the Fourteenth Amendment of the Constitution requires that law enforcement treat all similarly situated people alike.

207.    The Bar was the only bar in the entire 110th Precinct frequented primarily by African-Americans, a protected class of citizens.

208.    The Bar was a member of a similarly situated group of businesses within the 110th Precinct – specifically, businesses regulated by the ABC Laws (most of which, if not all, served alcohol).

209.    The Police Officer Defendants conducted three raids in 36 days – between August 24, 2012 and September 29, 2012 – and another on December 14.  The period of time between

the raids on September 28-29 and December 14 was interrupted by Hurricane Sandy, which hit

on or about October 29, 2012. The Bar was shut down for most (or all) of November 2012.

210.    Upon information and belief, the Police Officer Defendants conducted their raids

of the Bar under the pretext of the ABC Laws to oppress, harass, and ruin Plaintiff's business.

211.    During the time period between August 24, 2012 and December 14, 2012,

members of the 110th Precinct did not affect a search of any other bar (not frequented primarily

by African-Americans) pursuant to the ABC Laws.

212.    During the time period between August 24, 2012 and December 14, 2012,

members of the 110th Precinct did not affect a search of any other business (not frequented

primarily by African-Americans) pursuant to the ABC Laws.

213.    The Police Officer Defendants engaged in selective enforcement of the ABC

Laws, in violation of 42 U.S.C. 1983 and the Fourteenth Amendment's equal protection clause,

by conducting raids on a bar frequented by African-Americans (based on racial discrimination)

while leaving other bars (and bar owners) alone.

214.    The Police Officer Defendants engaged in selective enforcement of the ABC

Laws, in violation of 42 U.S.C. 1983 and the Fourteenth Amendment's equal protection clause,

by conducting raids on a bar frequented by African-Americans (based on racial discrimination)

while leaving other businesses (and business owners) alone.

215.    The Police Officer Defendants stopped the raids only after the Assistant District

Attorney called the 110th Precinct and instructed them to stop raiding the Bar.

216.    The actions taken by the Police Officer Defendants caused Plaintiff to sustain the

Injuries.

217.    The actions taken by the Police Officer Defendants infringed upon Plaintiff's (and her patrons') rights to use and enjoy the Bar.

218.    The actions taken by the Police Officer Defendants caused Plaintiff to be unable to maintain her business.  The Police Officer Defendants shut the Bar down.

219.    The actions taken by the Police Officer Defendants caused others to cancel then-existing contracts/business relationships with the Bar.

220.    The actions set forth in this claim for relief, which were taken by the defendants named in this claim for relief, are, and were, the proximate cause of the Injuries (as defined above), including (but certainly not limited to) the financial ruin of the Bar, the confiscation of Plaintiff's gun and license to carry a firearm, and Plaintiff's inability to work effectively in security and as a private investigator – that is, lost earnings – because of the confiscation of Plaintiff's firearm and license to carry a firearm.

## THIRD CLAIM FOR RELIEF
## VIOLATION OF 42 U.S.C. 1983 – FALSE ARREST/FALSE IMPRISONMENT
### As Against Defendants Larosa, Leguernic, Starrantino, King, Xerri, and Calderon

221.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 220, inclusive, as though fully set forth herein.

222.    Under the Fourth and Fourteenth Amendments of the Constitution of the United States of America and 42 U.S.C. 1983, Plaintiff has the right to be free from unreasonable and illegal searches and seizures, including false arrests.

223.    Defendant Larosa and Defendant Leguernic violated Plaintiff's rights when they intentionally arrested Plaintiff, who was conscious at the time, without justification, privilege, or probable cause on September 29, 2012.

224.     Defendant Larosa and Defendant Leguernic took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with the NYPD and Defendant City of New York on September 29, 2012.

225.     Defendant Larosa and Defendant Leguernic were acting under color of state law at all times during the incidents giving rise to this action.

226.     Defendant Larosa and Defendant Leguernic took these actions at the command (and under the supervision) of Defendant Starrantino and Defendant King on September 29, 2012.

227.     Defendant King and Defendant Starrantino, in their supervisory capacity, took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with the NYPD and Defendant City of New York on September 29, 2012.

228.     Defendant King and Defendant Starrantino were acting under color of state law at all times during the incidents giving rise to this action.

229.     Defendant Xerri violated Plaintiff's rights when he intentionally arrested Plaintiff, who was conscious at the time, without consent, justification, privilege, or probable cause on December 14, 2012.

230.     Defendant Xerri took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with the NYPD and Defendant City of New York on December 14, 2012.

231.     Defendant Xerri was acting under color of state law at all times during the incidents giving rise to this action.

232.    Defendant Xerri took these actions at the command (and under the supervision) of Defendant Calderon and Defendant Starrantino, acting in their supervisory roles, on December 14, 2012.

233.    Defendant Calderon and Defendant Starrantino, in their supervisory capacity, took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with the NYPD and Defendant City of New York on December 14, 2012.

234.    Defendant Calderon and Defendant Starrantino were acting under color of state law at all times during the incidents giving rise to this action.

235.    The prosecution was terminated in Plaintiff's favor after she made several appearances in criminal court.

236.    The actions taken by Defendant Larosa, Defendant Leguernic, Defendant Starrantino, Defendant King, Defendant Xerri, and Defendant Calderon caused Plaintiff to sustain the Injuries.

237.    The actions taken by Defendant Larosa, Defendant Leguernic, Defendant Starrantino, Defendant King, Defendant Xerri, and Defendant Calderon against Plaintiff were willful, wanton, reckless, and/or malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

238.    The actions set forth in this claim for relief, which were taken by the defendants named in this claim for relief, are, and were, the proximate cause of the Injuries (as defined above), including (but certainly not limited to) the financial ruin of the Bar, the confiscation of Plaintiff's gun and license to carry a firearm, and Plaintiff's inability to work effectively in security and as a private investigator – that is, lost earnings – because of the confiscation of Plaintiff's firearm and license to carry a firearm.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF 42 U.S.C. 1983 – ILLEGAL/WARRANTLESS SEARCHES**
**As Against the Police Officer Defendants**

239.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 238, inclusive, as though fully set forth herein.

240.    Under the Fourth and Fourteenth Amendments of the Constitution of the United States of America and 42 U.S.C. 1983, Plaintiff has the right to be free from unreasonable and illegal searches and seizures.

241.    Certain of the Police Officer Defendants did not have a valid warrant to search the Bar on August 24, 2012.

242.    Defendant Shafidiya and certain of the Police Officer Defendants did not have a valid warrant to search the Bar on August 27, 2012.

243.    Defendant Larosa, Defendant Leguernic, and Defendant Starrantino did not have a valid warrant to search the Bar on September 28-29, 2012.

244.    Defendant Xerri, Defendant Larosa, Defendant Starrantino, and Defendant Calderon did not have a valid warrant to search the Bar on December 14, 2012.

245.    Defendant Shafidiya and certain of the Police Officer Defendants did not have a valid warrant to search the Bar and harass its patrons on December 22, 2013.

246.    Certain of the Police Officer Defendants did not have probable cause (or other justification) to search the Bar on August 24, 2012.

247.    Defendant Shafidiya and certain of the Police Officer Defendants did not have probable cause (or other justification) to search the Bar on August 27, 2012.

248.    Defendant Larosa, Defendant Leguernic, and Defendant Starrantino did not have probable cause to search the Bar on September 28-29, 2012.

249.     Defendant Xerri, Defendant Larosa, Defendant Starrantino, and Defendant Calderon did not have probable cause (or other justification) to search the Bar on December 14, 2012.

250.     Defendant Shafidiya and certain of the Police Officer Defendants did not have probable cause (or other justification) to search the Bar on December 22, 2013.

251.     Certain of the Police Officer Defendants were not acting pursuant to any lawful authority when they searched the Bar on August 24, 2012.

252.     Defendant Shafidiya and certain of the Police Officer Defendants were not acting pursuant to any lawful authority when they searched the Bar on August 27, 2012.

253.     Defendant Larosa, Defendant Leguernic, and Defendant Starrantino were not acting pursuant to any lawful authority when they searched the Bar on September 28-29, 2012.

254.     Defendant Xerri, Defendant Larosa, Defendant Starrantino, and Defendant Calderon were not acting pursuant to any lawful authority when they searched the Bar on December 14, 2012.

255.     Defendant Shafidiya and certain of the Police Officer Defendants were not acting pursuant to any lawful authority when they searched the Bar on December 22, 2013.

256.     Certain of the Police Officer Defendants searched the Bar on August 24, 2012 in bad faith and in a manner not consistent with any lawful authority.

257.     Defendant Shafidiya and certain of the Police Officer Defendants searched the Bar on August 27, 2012 in bad faith and in a manner not consistent with any lawful authority.

258.     Defendant Larosa, Defendant Leguernic, and Defendant Starrantino searched the Bar on September 28-29, 2012 in bad faith and in a manner not consistent with any lawful authority.

259.    Defendant Xerri, Defendant Larosa, Defendant Starrantino, and Defendant Calderon searched the Bar on December 14, 2012 in bad faith and in a manner not consistent with any lawful authority.

260.    Defendant Shafidiya and certain of the Police Officer Defendants searched the Bar on December 22, 2013 in bad faith and in a manner not consistent with any lawful authority.

261.    Certain of the Police Officer Defendants searched the Bar on August 24, 2012 to target and harass Plaintiff and her African-American patrons.

262.    Defendant Shafidiya and certain of the Police Officer Defendants searched the Bar on August 27, 2012 to target and harass Plaintiff and her African-American patrons.

263.    Defendant Larosa, Defendant Leguernic, and Defendant Starrantino searched the Bar on September 28-29, 2012 to target and harass Plaintiff and her African-American patrons.

264.    Defendant Xerri, Defendant Larosa, Defendant Starrantino, and Defendant Calderon searched the Bar on December 14, 2012 to target and harass Plaintiff and her African-American patrons.

265.    Defendant Shafidiya and certain of the Police Officer Defendants searched the Bar on December 22, 2013 to target and harass Plaintiff and her African-American patrons.

266.    Defendant Larosa, Defendant Leguernic, Defendant Starrantino, and certain of Defendant John Does violated Plaintiff's rights when they intentionally seized items from the walls, broke the door to the basement, and took five thousand dollars from the basement, among other things, on September 28-29, 2012.

267.    Defendant King, in his supervisory role (as a lieutenant), ordered at least four of the five raids on the Bar (on August 24, 2012, August 27, 2012, September 28-29, 2012, and December 14, 2012).

268.     Defendant Calderon, in his supervisory role (as a lieutenant), ordered and supervised the raid on the Bar on December 14, 2012.

269.     Defendant John Doe 1, in his or her supervisory role, ordered Defendant Shafidiya to shut the Bar down.

270.     The actions of Defendant Larosa, Defendant Leguernic, Defendant Starrantino, Defendant King, Defendant Xerri, Defendant Calderon, Defendant John Doe 1, and Defendant Shafidiya caused Plaintiff to sustain the Injuries.

271.     Defendant Larosa, Defendant Leguernic, Defendant Starrantino, Defendant King, Defendant Xerri, Defendant Calderon, Defendant John Doe 1, and Defendant Shafidiya took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with the NYPD and Defendant City of New York.

272.     Defendant Larosa, Defendant Leguernic, Defendant Starrantino, Defendant King, Defendant Xerri, Defendant Calderon, Defendant John Doe 1, and Defendant Shafidiya were acting under color of state law at all times during the incidents giving rise to this action.

273.     The actions taken by Defendant Larosa, Defendant Leguernic, Defendant Starrantino, Defendant King, Defendant Xerri, Defendant Calderon, Defendant John Doe 1, and Defendant Shafidiya against Plaintiff were willful, wanton, reckless, and/or malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

274.     The actions set forth in this claim for relief, which were taken by the defendants named in this claim for relief, are, and were, the proximate cause of the Injuries (as defined above), including (but certainly not limited to) the financial ruin of the Bar, the confiscation of Plaintiff's gun and license to carry a firearm, and Plaintiff's inability to work effectively in

security and as a private investigator – that is, lost earnings – because of the confiscation of

Plaintiff's firearm and license to carry a firearm.

## FIFTH CLAIM FOR RELIEF
### VIOLATION OF 42 U.S.C. 1983 – ILLEGAL SEIZURES
### As Against the Gun Licensing Defendants and
### Defendants Larosa, Leguernic, and Starrantino

275.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1

through 274, inclusive, as though fully set forth herein.

276.     Under the Fourth and Fourteenth Amendments of the Constitution of the United

States of America and 42 U.S.C. 1983, Plaintiff has the right to be free from unreasonable and

illegal searches and seizures.

277.     The Gun Licensing Defendants seized Plaintiff's firearm without any cause or

justification.

278.     The Gun Licensing Defendants have refused to return Plaintiff's firearm without

any cause or justification.

279.     The Gun Licensing Defendants cancelled Plaintiff's license to carry a firearm

without any cause or justification.

280.     The Gun Licensing Defendants have refused to reinstate Plaintiff's license to

carry a firearm without any cause or justification.

281.     The Gun Licensing Defendants' actions, in part, caused Plaintiff to sustain the

Injuries.

282.     The Gun Licensing Defendants took the aforementioned actions against Plaintiff

during the course, and within the scope, of employment with the NYPD and Defendant City of

New York.

283.    The Gun Licensing Defendants were acting under color of state law at all times during the incidents giving rise to this action.

284.    Defendant Larosa, Defendant Leguernic, Defendant Starrantino, and certain of Defendant John Does violated Plaintiff's rights when they intentionally seized items from the Bar, including items on the walls, broke the door to the basement, and took five thousand dollars from the basement, among other things, on September 28-29, 2012.

285.    Defendant Larosa, Defendant Leguernic, Defendant Starrantino, and certain of Defendant John Does took the aforementioned actions against Plaintiff during the course, and within the scope, of employment with the NYPD and Defendant City of New York.

286.    Defendant Larosa, Defendant Leguernic, Defendant Starrantino, and certain of Defendant John Does were acting under color of state law at all times during the incidents giving rise to this action.

287.    The actions taken by the Gun Licensing Defendants, Defendant Larosa, Defendant Leguernic, Defendant Starrantino, and certain of Defendant John Does against Plaintiff were willful, wanton, reckless, and/or malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

288.    The actions set forth in this claim for relief, which were taken by the defendants named in this claim for relief, are, and were, the proximate cause of the Injuries (as defined above), including (but certainly not limited to) the financial ruin of the Bar, the confiscation of Plaintiff's gun and license to carry a firearm, and Plaintiff's inability to work effectively in security and as a private investigator – that is, lost earnings – because of the confiscation of Plaintiff's firearm and license to carry a firearm.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF 42 U.S.C. 1983 – FAILURE TO INTERVENE**
**As Against the Police Officer Defendants and the Gun Licensing Defendants**

289.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 288, inclusive, as though fully set forth herein.

290.    Under the Constitution of the United States of America and 42 U.S.C. 1983, police officers (and other state actors) have an affirmative duty to protect the constitutional rights of citizens by intervening when other police officers (and other state actors) commit constitutional violations in their presence.

291.    One or more of the Police Officer Defendants violated Plaintiff's constitutional rights when, in his/her/their presence, one or more of the remaining the Police Officer Defendants falsely arrested Plaintiff, yet did not intervene to protect Plaintiff.

292.    One or more of the Police Officer Defendants violated Plaintiff's constitutional rights when, in his/her/their presence, certain of the other Police Officer Defendants falsely imprisoned Plaintiff, yet did not intervene to protect Plaintiff.

293.    One or more of the Police Officer Defendants violated Plaintiff's constitutional rights when, in his/her/their presence, certain of the other Police Officer Defendants illegally searched the Bar without a warrant or other justification, yet did not intervene to protect Plaintiff.

294.    The Police Officer Defendants' (in)actions caused Plaintiff to sustain the Injuries.

295.    The Police Officer Defendants took the aforementioned (in)actions against Plaintiff during the course, and within the scope, of employment with Defendant City of New York.

296.    The (in)actions taken by the Police Officer Defendants against Plaintiff were willful, wanton, reckless, and/or malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

297.    One or more of the Gun Licensing Defendants violated Plaintiff's constitutional rights when, in his/her/their presence, one or more of the remaining the Gun Licensing Defendants illegally seized Plaintiff's property, yet did not intervene to protect Plaintiff.

298.    One or more of the Gun Licensing Defendants violated Plaintiff's constitutional rights when, in his/her/their presence, one or more of the remaining the Gun Licensing Defendants cancelled Plaintiff's permit to carry a concealed weapon, yet did not intervene to protect Plaintiff.

299.    The Gun Licensing Defendants' (in)actions caused Plaintiff to sustain the Injuries.

300.    The Gun Licensing Defendants took the aforementioned (in)actions against Plaintiff during the course, and within the scope, of employment with Defendant City of New York.

301.    The (in)actions taken by the Gun Licensing Defendants against Plaintiff were willful, wanton, reckless, and/or malicious, and therefore entitle Plaintiff to punitive damages in an amount to be determined at trial.

302.    The actions set forth in this claim for relief, which were taken by the defendants named in this claim for relief, are, and were, the proximate cause of the Injuries (as defined above), including (but certainly not limited to) the financial ruin of the Bar, the confiscation of Plaintiff's gun and license to carry a firearm, and Plaintiff's inability to work effectively in security and as a private investigator – that is, lost earnings – because of the confiscation of Plaintiff's firearm and license to carry a firearm.

**SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF 42 U.S.C. 1983 – MUNICIPAL LIABILITY**
**As Against Defendant City of New York**

303.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 302, inclusive, as though fully set forth herein.

304.    Members of the NYPD's Gun Licensing Division engage in the practice of cancelling gun permits for ex-NYPD officers with whom NYPD officials are disgruntled.

305.    Members of the NYPD's Gun Licensing Division engage in the practice of cancelling gun licenses for ex-NYPD officers with whom NYPD officials are disgruntled.

306.    For example, on or about September 9, 2014, Nassau County's Gun Licensing Division cancelled the gun license of former NYPD officer Corey Pegues, a former NYPD officer, in retaliation for writing a book which sometimes portrays the NYPD in an unfavorable light in order to "honor[] the NYPD's request."  See Pegues v. The County of Nassau, et al., 2:15-cv-01930-JMA-SIL (filed on Apr. 8, 2015) at Dkt. No. 1 (Complaint).

307.    The foregoing policies and/or practices are unconstitutional.

308.    The foregoing policies and procedures promulgated (in writing) or adopted by Defendant City of New York, in existence at the time of the incidents giving rise to this action, violated federal law on their face or were intended to deprive citizens of their constitutional rights.

309.    Defendant City of New York has shown a deliberate indifference towards citizens with respect to the foregoing unconstitutional policies.

310.    Plaintiff sustained injuries as a result of Defendant City of New York's unconstitutional policies.

311.    The aforementioned actions of the Gun Licensing Defendants resulted from, and were taken pursuant to, the above-mentioned *de facto* policies and/or well-settled and widespread customs and practices of Defendant City of New York.

312.    Defendant City of New York is liable and responsible for all injuries resulting from its deliberate indifference to these unconstitutional practices.

313.    The actions set forth in this claim for relief are, and were, the proximate cause of the Injuries (as defined above), including (but certainly not limited to) the confiscation of Plaintiff's gun and license to carry a firearm, and Plaintiff's inability to work effectively in security and as a private investigator – that is, lost earnings – because of the confiscation of Plaintiff's firearm and license to carry a firearm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment in her favor and against Defendants for the following relief:

a.    compensatory damages as against Defendants, jointly and severally, in an amount to be determined at trial but not less than five hundred thousand dollars ($500,000.00);

b.    punitive damages as against Defendants, jointly and severally, in an amount to be determined at trial but not less than two hundred thousand dollars ($200,000.00);

c.    injunctive relief as against Defendants for the release of Plaintiff's firearm to Plaintiff;

d.    injunctive relief as against Defendants for the full reinstatement of Plaintiff's license to carry a concealed firearm;

e.      attorney's fees incurred during this action, pursuant to 42 U.S.C. 1988(b) and any

other applicable law, the determination of which lies within the sound discretion

of this Court;

f.      costs incurred during this action, pursuant to 42 U.S.C. 1988(b) and any other

applicable law, the determination of which lies within the sound discretion of this

Court;

g.      expert fees incurred during this action, pursuant to 42 U.S.C. 1988(c) and any

other applicable law, the determination of which lies within the sound discretion

of this Court;

h.      all statutory interest on any sums awarded to Plaintiff; and

i.      such other and further relief as the Court deems proper and fair.

Dated: New York, New York
       April 11, 2016

Respectfully submitted,

MARK A. MARINO, PC


____/s/ Mark A. Marino_____
Mark A. Marino (MM0676)
*Attorney for Plaintiff Sonya Glover*
380 Lexington Avenue, 17th Floor
New York, New York 10168
Tel:  212.748.9552
Fax:  646.219.5350