UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

SONYA GLOVER,

                              Plaintiff,                          **MEMORANDUM & ORDER**
                                                                 15-CV-4899 (MKB)

                    v.


CITY OF NEW YORK, P.O. JOSEPH LAROSA, P.O.
BRIAN LEGUERNIC, P.O. JOSEPH XERRI, SGT.
MATTHEW STARRANTINO, CAPTAIN JAMES
KING, DEPUTY INSPECTOR ANDREW LUNETTA,
ASSOC. INVESTIGATOR PAMELA BREWSTER,
SGT. EUNICE SHAFIDIYA, LT. PETER
CALDERON, and JOHN DOES 1–14,

                              Defendants.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

       Plaintiff Sonya Glover commenced the above-captioned action on August 20, 2015

against Defendants the City of New York, New York City Police Department ("NYPD") Officers

Joseph Larosa, Brian Leguernic, and Joseph Xerri, Sergeant Matthew Starrantino, Captain James

King, Deputy Inspector Andrew Lunetta, Associate Investigator Pamela Brewster, John Does 1–

15, and Jane Doe.  (Compl., Docket Entry No. 1.)  On April 12, 2016, Plaintiff filed an Amended

Complaint adding Defendants Sergeant Eunice Shafidiya and Lieutenant Peter Calderon.  (Am.

Compl., Docket Entry No. 22.)  Plaintiff asserts claims for retaliation under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), and selective enforcement, false

arrest and false imprisonment, illegal search and seizure, and failure to intervene under 42 U.S.C.

§ 1983, and for municipal liability pursuant to *Monell v. Department of Social Services of City of

New York*, 436 U.S. 658 (1978).  (*Id.* ¶¶ 191–313.)

Currently before the Court are Defendants' motion for summary judgment, and Plaintiff's motions for partial summary judgment and to amend the pleadings.[1] For the reasons set forth below, the Court grants in part and denies in part Defendants' motion for summary judgment, and denies Plaintiff's motions for partial summary judgment and to amend the pleadings.

## I. Background

### a. Factual background

The following facts are undisputed unless otherwise noted.

Plaintiff, an African-American woman, is a former NYPD officer. (Defs. Rule 56.1 Statement of Undisputed Material Facts ("Defs. 56.1") ¶¶ 1–2, Docket Entry No. 63.) She was employed by the NYPD for twenty years, beginning in April of 1991 until her retirement in April of 2011. (*Id.* ¶ 1.)

During her employment with the NYPD, Plaintiff brought several lawsuits and internal complaints against the NYPD and its officers. In "approximately 1997 or 1998," Plaintiff filed a complaint with the Civilian Complaint Review Board against her supervisor. (*Id.* ¶ 3.) In 2001, while assigned to the "Housing Police, PSA3,"[2] Plaintiff intervened when she allegedly observed a group of housing police officers beating a handcuffed man, and internally reported the officers

_____

[1] (Defs. Mot. for Summ. J. ("Defs. Mot."), Docket Entry No. 61; Defs. Mem. in Supp. of Defs. Mot. ("Defs. Mem."), Docket Entry No. 62; Decl. of Beth J. Hoffman in Supp. of Defs. Mot. ("Hoffman Decl."), Docket Entry No. 64; Pl. Mot. for Partial Summ. J. ("Pl. Mot."), Docket Entry No. 69; Pl. Mem. in Supp. of Pl. Mot. ("Pl. Mem."), Docket Entry No. 70; Decl. of Mark A. Marino in Supp. of Pl. Mot. ("Marino Decl."), Docket Entry No. 72; Pl. Mot. to Amend, Docket Entry No. 89.)

[2] The Court understands "PSA3" to refer to Police Service Area 3, the NYPD Housing Bureau which serves New York City Housing Authority developments within the confines of the 79th, 81st, 84th, 88th, and 90th precincts. *See* Police Service Area 3, https://www1.nyc.gov/site/nypd/bureaus/transit-housing/police-service-area-3.page (last visited Aug. 20, 2018).

involved. (*Id.* ¶ 5.) In 2004, Plaintiff was one of multiple plaintiffs who brought a lawsuit against the NYPD alleging racial discrimination. (*Id.* ¶ 8.) In "either approximately May of 2005 . . . or in 2007 [or] 2008," Plaintiff filed an internal complaint with the Equal Employment Opportunity Commission against another NYPD officer for gender discrimination. (*Id.* ¶ 9.) In January of 2007, Plaintiff filed a lawsuit in New York state court, alleging retaliation and discrimination based on race, sex, and sexual orientation.[3] (*Id.* ¶ 12.) Among the defendants named in the 2007 lawsuit were two police officers from the NYPD's 110th Precinct.[4] (*Id.*) Plaintiff asserts that the 2007 lawsuit settled in 2010. (Pl. Statement of Additional Material Facts ¶ 164, Docket Entry No. 74.)

In July of 2011, after retiring from the NYPD, Plaintiff opened a business called Onyxx Lounge,[5] located at 103-02 Corona Avenue in Corona, Queens, within the confines of the NYPD's 110th Precinct. (Defs. 56.1 ¶ 16; Pl. Rule 56.1 Statement of Undisputed Material Facts

---

[3] Plaintiff asserts that the 2007 lawsuit alleged that she was also retaliated against for, *inter alia*, reporting the 2001 beating incident. (Pl. Statement of Additional Material Facts ¶ 165, Docket Entry No. 74.)

[4] The two police officers are not named as defendants in this action. (Defs. 56.1 ¶ 12.)

[5] While the Amended Complaint and Defendants' 56.1 statement both state that Plaintiff opened Onyxx Lounge in February of 2012, (*see* Am. Compl. ¶ 1; Defs. 56.1 ¶ 16), Plaintiff asserts in response to Defendants' 56.1 statement that "[a]ccording to [Plaintiff's] deposition testimony, Onyxx Lounge opened for business in July 2011," and the Amended Complaint "is incorrect to the extent it differs," (Pl. Response to Defs. 56.1 ("Pl. Resp.") ¶ 16, Docket Entry No. 74). Contradicting their prior assertion of fact, Defendants state later in their 56.1 statement that Onyxx Lounge "opened for business at the end of July 2011," a fact that Plaintiff does not dispute. (Defs. 56.1 ¶ 21; Pl. Resp. ¶ 21.) The Court therefore deems undisputed the fact that Onyxx Lounge opened in July of 2011, and not February of 2012.

("Pl. 56.1") ¶ 40, Docket Entry No. 71; Pl. Statement of Additional Material Facts ¶ 147.)[6]

While employed by the NYPD, Plaintiff never worked at the 110th Precinct.  (Defs. 56.1 ¶ 17.)

According to Plaintiff, Onyxx Lounge was located in an "overwhelmingly Hispanic and

Caucasian" neighborhood, but patronized predominantly by African Americans.  (Pl. Statement

of Additional Material Facts ¶ 156.)

Plaintiff's claims arise from several incidents at Onyxx Lounge, where Plaintiff alleges

officers engaged in unlawful searches and seizures over more than a year, in violation of her

constitutional rights.

### i.   Incidents involving Plaintiff and NYPD officers at Onyxx Lounge

### 1.   June through August 24, 2012 incidents

The parties dispute the extent to which Sergeant Shafidiya and other NYPD officers

inspected Onyxx Lounge or patrolled its vicinity prior to August 27, 2012.[7]  Plaintiff alleges that

NYPD officers, including Shafidiya, patrolled and inspected Onyxx Lounge prior to August 27,

2012.  (Pl. Statement of Additional Material Facts ¶ 66.)  Defendants assert that Shafidiya "had

never heard of the Onyxx Lounge" prior to August 27, 2012.[8]  (Defs. 56.1 ¶ 66.)

---

[6]  Plaintiff's Response to Defendants' Rule 56.1 Statement, and Statement of Additional
Material Facts, are contained in the same filing.  (*See* Pl. Resp. and Pl. Statement of Additional
Material Facts, Docket Entry No. 74.)

[7]  Pursuant to the New York State Liquor Authority ("SLA"), NYPD officers are
authorized to conduct warrantless searches of premises that are licensed to sell alcohol.  (Defs.
56.1 ¶¶ 40, 60.)  The SLA is an "alcoholic beverage control division" within the executive
department of the New York state government.  *See* N.Y. Alco. Bev. Cont. Law § 10.  The SLA is
charged with, *inter alia*, enforcing violations of the Alcoholic Beverage Control state law (the
"A.B.C. Law"), and "revok[ing], cancel[ing] or suspend[ing] . . . any license or permit" to sell
alcohol when warranted.  *See id.* § 17(3).

[8]  Most of Plaintiff's assertions regarding NYPD inspections and harassment prior to
August 27, 2012 are contained in her statement of additional disputed material facts, to which

Plaintiff asserts that on approximately eighteen dates between June and August of 2012, NYPD officers harassed her and her business, including on June 10, 2012, when Shafidiya "came to the Onyxx Lounge."[9]  (Pl. Mem. in Opp'n to Defs. Mot. ("Pl. Opp'n") 5, Docket Entry No. 73; Pl. Statement of Additional Material Facts ¶¶ 179–80.)  Beginning in August of 2012, "Shafidaya [sic] was either inside or posted outside (in a police vehicle) of the Onyxx Lounge four to five times per month."  (Pl. Resp. to Defs. 56.1 ("Pl. Resp.") ¶ 66, Docket Entry No. 74.)

Plaintiff asserts that on August 24, 2012, she was hosting a party at Onyxx Lounge, when around 10:00 or 11:00 PM,[10] five police officers entered "without a warrant or explanation."  (Pl. Statement of Additional Material Facts ¶ 189.)  According to Plaintiff, a "sergeant looked at [her] licenses . . . while the other four police officers spread out and walked through the Onyxx Lounge."  (*Id.* ¶ 190.)  The inspection "yielded no summonses or other findings of wrongdoing."  (*Id.* ¶ 192.)  After the officers left Onyxx Lounge, "two officers stayed back in a patrol car and got out periodically to harass patrons."  (*Id.* ¶ 193.)  Defendants deny that any officers were present at Onyxx Lounge on August 24, 2012.  (Defs. Mem. 9 n.6.)

---

Defendants did not respond.  The record therefore lacks a direct response from Defendants as to whether, prior to August 27, 2012, NYPD officers *other than Shafidiya* conducted any inspection of Onyxx Lounge or patrolled its vicinity.  (*See, e.g.,* Pl. Statement of Additional Material Facts ¶¶ 179–81, 189, 192, 193); *see also* Local Civ. R. 56.1(b) ("The papers opposing a motion for summary judgment shall include . . . if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried.").)

[9]  Plaintiff does not provide further detail regarding what, if anything, Shafidiya did once at Onyxx Lounge on June 10, 2012.

[10]  While Plaintiff asserts in her statement of additional material facts that the officers arrived at approximately 9:00 PM, (Pl. Statement of Additional Material Facts ¶ 189), Plaintiff testified at her deposition that they arrived at "around 10:00, 11:00 PM," (Glover Dep. 167:18–23, annexed to Hoffman Decl. as Ex. B, Docket Entry No. 64-2).

## 2. August 27, 2012 incidents

On the night of August 27, 2012, Plaintiff held a private party at Onyxx Lounge. (Defs. 56.1 ¶ 63.) Shafidiya "received multiple reports of calls complaining about [Onyxx Lounge], including noise complaints[,] . . . marijuana use," and fighting. (*Id.* ¶ 65.)

Later that night, after responding to a different call in the vicinity, while driving by Onyxx Lounge in an unmarked car, Shafidiya "smelled and observed people smoking marijuana outside of [Onyxx Lounge]." (*Id.* ¶ 64.) Shafidiya then drove by the lounge a second time and told the individuals to go inside. (*Id.*)

Shafidiya ultimately decided to enter the premises. (*Id.* ¶ 63.) She entered Onyxx Lounge at approximately 10:00 or 11:00 PM, and was at some point that night joined by six other NYPD officers.[11] (*Id.*; Pl. Resp. ¶ 63.) Defendants assert that Shafidiya and the officers entered the lounge to "inform who[m]ever was in charge about the civil complaints," "request that they tell their patrons to please stay inside in order to prevent future complaints," and "perform a business inspection while [Shafidiya and the officers] were there . . . ." (Defs. 56.1 ¶ 67.) Plaintiff contends that Shafidiya and the officers entered Onyxx Lounge "in bad faith to harm [Plaintiff] and her patrons." (Pl. Resp. ¶ 67.)

While inside, Shafidiya inspected several of Plaintiff's licenses and asked that Plaintiff keep her patrons inside in order to avoid further complaints. (Defs. 56.1 ¶¶ 67–68.) Defendants assert that Shafidiya observed younger-looking patrons consuming alcohol and asked to see their identification. (*Id.* ¶ 70.) Defendants further assert that although "[o]fficers did encounter

---

[11] The record is unclear as to whether the officers entered the premises with Shafidiya or whether they subsequently joined her. (*See* Defs. 56.1 ¶¶ 64–69.)

violations of underage drinking,"[12] Shafidiya "used her discretion" and did not "take any enforcement measures" or "document any of the violations observed." (*Id.*) Plaintiff contends that Defendants have no evidence that she permitted underage patrons in Onyxx Lounge, permitted her bartenders to serve underage patrons, or had any conversation with Shafidiya about underage drinking. (Pl. Resp. ¶ 70.)

Shafidiya did not issue any summonses, and did not observe the other officers issuing summonses or arresting any patrons. (Defs. 56.1 ¶ 71.)

### 3. September 29, 2012 incidents, including Plaintiff's arrest

On the night of September 29, 2012,[13] Plaintiff rented out Onyxx Lounge for a promotional event with a live DJ. (*Id.* ¶ 72.) Officers Larosa and Leguernic responded to a "radio run" for three males seen smoking marijuana and urinating on the sidewalk outside the lounge. (*Id.* ¶ 74.) Plaintiff believes the officers came to Onyxx Lounge because someone called the police. (*Id.* ¶ 77.)

The officers arrived at Onyxx Lounge sometime between 10:00 and 11:30 PM. (*Id.* ¶ 73.) Upon arriving, Larosa stopped and frisked three African-American males outside Onyxx Lounge who fit the description provided on the radio run. (*Id.* ¶ 76.) The officers did not find any evidence of marijuana. (Pl. 56.1 ¶ 35.) When Plaintiff observed the interactions on the sidewalk

---

[12] Notwithstanding Defendants' assertion that "[o]fficers did encounter violations of underage drinking," (*see* Defs. 56.1 ¶ 70), Shafidiya testified at her deposition that she does not "remember if [the allegedly underage patrons] were able to produce ID showing that they were [twenty-one]" in order to determine whether her suspicions were correct, (Shafidiya Dep. 186:13–15, annexed to Hoffman Decl. as Ex. G, Docket Entry No. 64-7).

[13] Although certain of the events summarized took place before 12:00 AM and therefore occurred on September 28, 2012, the Court refers to the September 29, 2012 date throughout this Memorandum and Order for ease of reference.

outside the lounge, she confronted the officers over what she believed to be an illegal search, (*id.* ¶ 37), and explained that she was the owner of Onyxx Lounge, (Defs. 56.1 ¶ 78). Larosa informed Plaintiff that there had been a radio call for that location. (*Id.* ¶ 79.) The officers wrote summonses for "certain of the individuals on the sidewalk" and left the vicinity. (*Id.* ¶¶ 80–81.)

At approximately 12:30 or 12:45 AM, Starrantino, Larosa, Leguernic, and other officers[14] returned to the premises in response to 911 calls "complaining of conditions at [Onyxx Lounge]." (*Id.* ¶¶ 81, 85.) Defendants contend that the officers arrived to find a "crowd of patrons" participating in a photoshoot on the sidewalk. (*Id.* ¶ 86.) Plaintiff contends that the officers "observed only a couple of people" outside the lounge. (Pl. Resp. ¶ 84.) Starrantino, as the supervising officer on patrol, decided that the officers should enter Onyxx Lounge and told Plaintiff that he would like to inspect the inside of Onyxx Lounge. (Defs. 56.1 ¶ 88; Defs. Resp. to Pl. 56.1 ("Defs. Resp.") ¶ 63, Docket Entry No. 66.) Plaintiff consented and took Starrantino and the officers inside, showing them her business licenses and credentials. (Defs. 56.1 ¶¶ 88–90.) The officers smelled marijuana while they were inside the lounge and brought it to

---

[14] The parties do not clearly identify the "other officers" who were present on the night of September 29, 2012. Defendants' 56.1 statement states that "Larosa returned to [Onyxx Lounge] accompanied by Officer Leguernic, Sergeant Starrantino, and 'Police Officer Defendants,'" a statement Plaintiff does not dispute. (Defs. 56.1 ¶ 81; Pl. Resp. ¶ 81.) However, Defendants' 56.1 statement does not define "Police Officer Defendants." (*See generally* Defs. 56.1.) The Amended Complaint defines "Police Officer Defendants" as "Defendant Larosa, Defendant Leguernic, Defendant Xerri, Defendant Starrantino, Defendant King, Defendant Calderon, Defendant Shafidiya, and certain of Defendant John Does." (Am. Compl. ¶ 45.) It is unclear whether Defendants intend to incorporate this definition of "Police Officer Defendants" into their 56.1 statement since neither party asserts that Sergeant King was present at the lounge that night. (*Id.* ¶¶ 127–28; *see also* Pl. Statement of Additional Material Facts ¶ 216.) An NYPD Internal Affairs Bureau report discussing Plaintiff's complaints regarding the September 29, 2012 incidents, discussed *infra*, indicates that the additional officers present were Officers David Russo, John DiNicola, and Gregory Denk, none of whom are defendants in this action. (Internal Affairs Bureau Investigating Findings 4, annexed to Hoffman Decl. as Ex. R, Docket Entry No. 64-18.)

Plaintiff's attention; however, the officers did not directly observe anyone smoking marijuana and therefore did not "take any enforcement action." (*Id.* ¶ 92.)

The officers issued Plaintiff summonses for the following violations of the A.B.C. Law: excessive noise outside Onyxx Lounge, an obstructed view into Onyxx Lounge, a locked front door to Onyxx Lounge, a front door to Onyxx Lounge that only swings inward rather than outward, an improperly obstructed sign that should have been conspicuously displayed, gambling, and lack of a required CPR kit. (*Id.* ¶¶ 91, 93–96.) Plaintiff disputes that the officers observed any violations and contends that the summonses were improper. (Pl. Resp. ¶¶ 91, 93–96.)

During the inspection, Plaintiff and Larosa heard voices coming from the basement of the lounge, and went downstairs to the basement. (Defs. 56.1 ¶ 97.) Prior to entering the basement, Plaintiff informed Larosa that "VIPs" were present there. (*Id.* ¶ 98.) Defendants contend that Larosa observed a group of people gathered around a "large casino gambling table on which there were dice and large sums of cash displayed." (*Id.* ¶ 103.) Plaintiff contends that no dice or money were on the table, which was not a "casino table," but a "gaming table" she purchased to play games with friends. (Pl. Resp. ¶¶ 101, 103.) Plaintiff asserts that Larosa concluded that gambling was occurring based only "on his personal 'feelings and his inclinations.'" (Pl. 56.1 ¶ 8.) Plaintiff does not dispute, however, that Larosa vouchered the table, $2,209 in cash, and dice from the basement of Onyxx Lounge. (Defs. 56.1 ¶¶ 105–06.) Plaintiff alleges that the officers stole $5000 from the basement of Onyxx Lounge while shutting down the event, and did not provide a voucher for the seized funds. (Am. Compl. ¶ 284.) In opposition to Defendants' motion for summary judgment, Plaintiff identifies Starrantino as the officer who allegedly stole the money. (Pl. Opp'n 12–13.)

Based on Larosa's observations, he arrested Plaintiff for promoting gambling in the second degree under section 225.05 of the New York Penal Law, and criminal nuisance in the second degree under section 240.45 of the New York Penal Law.[15]  (Defs. 56.1 ¶¶ 107–08.)

Officers took Plaintiff to the 110th Precinct.  (Pl. Statement of Additional Material Facts ¶ 215.)  When Plaintiff arrived, she spoke with Captain King, the officer on desk duty, who called her a "rat" and stated that "he knew who she was."  (*Id.* ¶ 216.)  Plaintiff was processed the next morning, arraigned that afternoon, and released on her own recognizance.  (Defs. 56.1 ¶¶ 109–10.)  All charges were dismissed on January 21, 2014 "pursuant to the state court's speedy trial provision."  (*Id.* ¶ 111; Pl. 56.1 ¶ 22.)

### 4.  October of 2012 incidents

In "early October 2012," Brewster, an associate investigator with the NYPD's Pistol Licensing Division, was "reviewing the file generated by Plaintiff's arrest," and observed that Plaintiff had not notified or made any attempt to notify the NYPD's Pistol Licensing Division of her arrest.  (Defs. 56.1 ¶ 136.)  Based on Plaintiff's failure to notify the Pistol Licensing Division of her arrest, Brewster recommended to her supervisor that Plaintiff's firearm license be suspended.  (*Id.* ¶ 138.)  Brewster's supervisor agreed.  (*Id.*)

Plaintiff received a letter dated October 12, 2012 from the NYPD's Pistol Licensing Division, signed by Lunetta, a deputy inspector within the NYPD's Pistol Licensing Division. The letter stated that in light of Plaintiff's September 29, 2012 arrest, Plaintiff must turn in her

---

[15]  Plaintiff was also later charged with a third crime, possession of a gambling device in the second degree under section 225.30-2 of the New York Penal Law.  (*See* Charging Aff., annexed to Hoffman Decl. as Ex. AA, Docket Entry No. 64-27; *see also* Arraignment Charges, annexed to Hoffman Decl. as Ex. BB, Docket Entry No. 64-28.)

firearms to the NYPD.[16]  (Defs. 56.1 ¶ 129.)  The letter also stated that the Pistol Licensing

Division was suspending Plaintiff's license to carry a concealed weapon.  (*Id.*)  Plaintiff turned

her firearms in to the NYPD on October 27, 2012.[17]  (*Id.* ¶ 130.)

Plaintiff's firearm license was reinstated in June of 2016, and Plaintiff's firearms were

returned to her in December of 2016.  (Defs. 56.1 ¶¶ 141–42.)

### 5.  December 14, 2012 incidents

On the evening of December 14, 2012, Lieutenant Calderon and other officers[18] went to

Onyxx Lounge to perform a follow-up business inspection.  At his deposition, Calderon testified

that, as the supervising officer on patrol, he made the decision to enter Onyxx Lounge based on

the violations and arrest that took place on September 29, 2012, and to determine whether

Plaintiff had corrected those issues.  (Defs. 56.1 ¶¶ 113–15; Calderon Dep. 173:5–18, annexed to

Hoffman Decl. as Ex. E, Docket Entry No. 64-5.)[19]  Plaintiff believes that the inspection was

"pretextual and performed in bad faith in order to injure [Plaintiff] and her patrons."  (Pl. Resp.

---

[16]  Pursuant to Title 38 of the Rules of the City of New York, gun owners are required to "make an immediate report" to the NYPD Pistol Licensing Division of, *inter alia*, an "[a]rrest, indictment, or conviction in any jurisdiction."  (Defs. 56.1 ¶¶ 132–33.)

[17]  Although Defendants' 56.1 statement suggests that Plaintiff turned in one firearm to the NYPD, (Defs. 56.1 ¶ 142), Plaintiff's 56.1 response, along with other documentation in the record, indicates that Plaintiff turned in two firearms, (Pl. Resp. ¶ 142; Glover Dep. 84:6–9, annexed to Marino Opp'n Decl. as Ex. 1, Docket Entry No. 76-1 (testifying that two weapons were listed on her firearm license); Firearm License Retrieval Paperwork, Docket Entry No. 31-1).

[18]  Plaintiff testified that she believes a total of twelve officers were present, (Glover Dep. 233:4–6, annexed to Marino Opp'n Decl. as Ex. 2, Docket Entry No. 76-2), but could only recall seeing Calderon, Larosa, Starrantino, and Xerri, (*id.* at 232:17–21).

[19]  The parties have submitted different portions of various deposition transcripts, which in some cases overlap but also contain excerpts not included in the other submitted portions.  The Court therefore provides the full citation when citing deposition testimony.

¶¶ 113–14.)

The officers entered the bar, and several of them immediately rushed downstairs to the basement. (Defs. 56.1 ¶ 115.) Lieutenant Calderon did not observe any illegal activity in the basement. (*Id.* ¶ 118.) The officers then inspected the remainder of the premises. Plaintiff testified that at some point during the inspection, she "was questioning [the officers] about searching [her] bar and [Starrantino] didn't like [her] frustration and he called [her] a 'black b***h,'" and further stated that he would "slap the sh*t out of [her] black a**." (Glover Dep. 107:3–16, annexed to Marino Opp'n Decl. as Ex. 1, Docket Entry No. 76-1.) Later on in her deposition, Plaintiff testified that at some point that same night, Starrantino said to her, "shut your black a** up before I lock you up." (Glover Dep. 236:18–23, annexed to Marino Opp'n Decl. as Ex. 2, Docket Entry No. 76-2.)

When the inspection of Onyxx Lounge was completed, officers issued Plaintiff summonses for violations related to an unlicensed security guard, an exit door swinging inward, unreasonable noise, an obstructed view into the lounge, and a failure to display a certificate of occupancy. (Defs. 56.1 ¶¶ 119–23.) Plaintiff asserts that the officers issued the summonses "without cause and in bad faith." (Pl. Resp. ¶¶ 119–23.) The summonses were later dismissed. (Defs. 56.1 ¶ 124.)

### 6. December 14, 2013 incidents

Plaintiff closed Onyxx Lounge to the general public sometime in early 2013. (Pl. 56.1 ¶ 48.) Plaintiff has no specific recollection of a visit from the NYPD on December 14, 2013, (Pl. Statement of Additional Material Facts ¶ 258), but relies on a "police action form"[20] produced by

---

[20] The record contains several documents entitled "Police Action – Licensed/Unlicensed Premises," referred to colloquially by the parties as "police action forms." These documents are

Defendants to assert that officers entered the premises during a private party held on this date and "shut [it] down." (Pl. 56.1 ¶ 59; Police Action Form dated Dec. 14, 2013, annexed to Marino Decl. as Ex. 5, Docket Entry No. 72-5.) The form contains, in a field entitled "Unit Submitting Report," the words "Midnight Patrol Sergeant." (Police Action Form dated Dec. 14, 2013.) The form also contains the name and address of Onyxx Lounge, along with Plaintiff's name. (*Id.*) However, no officer's name appears on the form. (*Id.*) The form also contains the following notation: "There was originally a radio run with un[known] males smoking marijuana outside the above establishment. Performed a 75-I. The party was shut down." (*Id.*; *see also* Pl. Statement of Additional Material Facts ¶ 254.) Relying on this form, and Defendants' concession that Shafidiya was assigned as patrol sergeant during the midnight tour on December 14, 2013, Plaintiff asserts that the NYPD, led by Shafidiya, improperly "shut down" the party without justification. (*Id.* ¶¶ 247–48, 250.)

Defendants do not appear to dispute that an inspection occurred on December 14, 2013. (*See* Defs. Resp. ¶¶ 51, 55–59 (discussing police action form dated December 14, 2013 and not denying that police were present at Onyxx Lounge on this date); Defs. Mem. in Opp'n to Pl. Mot. ("Defs. Opp'n") 16–17, Docket Entry No. 65 (discussing December 14, 2013 allegations and not denying a search occurred); Defs. Reply in Supp. of Defs. Mot. ("Defs. Reply") 10–12, Docket Entry No. 67 (same).) However, while Defendants concede that Shafidya was the patrol sergeant during the relevant time, they assert that "Shafidiya has no memory of being present at [Onyxx Lounge] that night, and neither Shafidiya's name nor signature appear on the [police action form]." (Defs. Reply 10–11.)

---

NYPD records of observed violations of the A.B.C. Law at licensed premises, as well as any enforcement action taken by the NYPD against premises within the SLA's jurisdiction.

### 7. December 22, 2013 incidents

The parties dispute whether the NYPD was present at Onyxx Lounge on December 22, 2013. Plaintiff contends that on this date, Shafidiya, accompanied by other officers, "came to the Onyxx Lounge one final time . . . during a party." (Pl. Statement of Additional Material Facts ¶ 260.) Plaintiff also asserts that during the visit, one of the officers "demanded that [the] lights be turned on and the music turned off, while other officers began picking up patrons' drinks and putting them up to their noses to smell them and requesting ID." (*Id.* ¶ 262.) "[W]hen patrons protested, they were frisked, shoved, and told to leave before they were arrested." (*Id.*) Plaintiff asserts that Shafidiya "told [her] that higher-ups at the 110th Precinct told her to 'inspect' the Onyxx Lounge." (*Id.* ¶ 264.) Defendants dispute that any officers visited or inspected Onyxx Lounge on December 22, 2013. (See Defs. Reply 10; Defs. Opp'n 4 n.3.)

### ii. Plaintiff's complaint to the NYPD Internal Affairs Bureau and its findings

Plaintiff made a complaint to the NYPD regarding the September 29, 2012 incidents, which were investigated by the NYPD Internal Affairs Bureau ("IAB"). The IAB detailed its findings in an April 14, 2014 report, a portion of which is included in the record. (IAB Investigation Findings, annexed to Hoffman Decl. as Ex. R, Docket Entry No. 64-18.)[21]

The report reflects that Plaintiff informed the NYPD "that after being released from

---

[21] The Court's summary of the IAB's findings includes facts not included in the parties' respective 56.1 statements. However, because the parties do not dispute that Plaintiff made these complaints, and that the IAB thereafter investigated them and issued findings, the Court includes this information in its summary of the relevant facts. *See Risco v. McHugh*, 868 F. Supp. 2d 75, 88 (S.D.N.Y. 2012) ("Where possible, the Court has relied on the undisputed facts in Defendant's 56.1 Statement; however, direct citations to the record have also been used where relevant facts were not included in either of the parties' Rule 56.1 submissions."); *see also Prescient Acquisition Grp., Inc. v. MJ Pub. Tr.*, 487 F. Supp. 2d 374, 375–76 (S.D.N.Y. 2007) (finding that record evidence not cited in the defendants' 56.1 statement is "fairly considered part of the record on the motion and, once submitted, could be relied upon by either party or the court").

Queens Criminal Court, she returned to the Onyx[x Lounge] and discovered that she was missing $5700.00 . . . from a cash box." (*Id.* at 2.)  Plaintiff further told investigators that at some unspecified time before or while she was being taken into custody, "she observed an unknown officer carrying a box that contained the missing currency," but "she did not know which one of the officers removed [it]." (*Id.*)  Plaintiff stated she "was never provided with a Property Clerk invoice" for the stolen funds. (*Id.*)

The IAB investigator discussed Plaintiff's complaints with "ADA Francis,"[22] from the Corruption Bureau within the Queens County District Attorney's Office. (*Id.* at 2–3.)  According to the report, Francis told the investigator that the officers present at Onyxx Lounge the night of September 29, 2012, explained that they were responding to a radio run. (*Id.*)  The officers further stated that when they arrived, males were smoking marijuana outside of Onyxx Lounge, and while performing an inspection inside, the officers smelled a strong odor of marijuana and observed illegal gambling. (*Id.*)  The report also reflects that ADA Francis told the investigator "that after interviewing the subject officers, [ADA Francis] determined that there was no wrongdoing on the behalf of the subject officers." (*Id.*)  The report does not reflect whether Francis asked any of the officers about Plaintiff's allegations regarding stolen money.

According to the report, Francis also told the investigator "that when she interviewed [Plaintiff], [she] was irate, used profanity, and was rude." (*Id.*)  Francis stated that when she spoke with Plaintiff, Plaintiff did not "allege[] that money was missing from the establishment during her interview." (*Id.*)  The investigator also noted that he reviewed video footage provided by Plaintiff's attorney that captured some of the events which occurred that night, but Plaintiff "refused to release any video that may have been recorded buy[sic] security cameras inside the

---

[22] The record does not reflect ADA Francis' first name.

premise." (*Id.* at 3.)

The NYPD conducted investigative hearings, during which Starrantino, Larosa, and Leguernic "denied having any knowledge of any missing money." (*Id.*) Officers Russo, DeNicola, and Denk were identified as the remaining officers present the night of September 29, 2012, but they "were not interviewed due to the fact that it would just elicit a denial." (*Id.* at 4.)

Based on the foregoing, the report reflects that the IAB investigator "was unable to prove or disprove if the aforementioned [NYPD officers] removed a cash box containing $5900.00[23] USC from the Onyx[x] Lounge," and recommended that the investigation into the officers' conduct be "closed as UNSUBSTANTIATED." (*Id.*)

### b. Procedural background

Plaintiff commenced this action on August 20, 2015.[24] (Compl.) Plaintiff filed the Amended Complaint on April 12, 2016, adding Calderon and Shafidiya as Defendants. (Am. Compl.)

### i. The Amended Complaint

The Amended Complaint asserts seven claims against various sets of Defendants.

First, Plaintiff asserts a Title VII employment retaliation claim against Defendants Larosa, Leguernic, Xerri, Starrantino, King, Calderon, Shafidiya, Lunetta, and Brewster, alleging that they engaged in a campaign of, *inter alia*, "harassing patrons, conducting four raids, issuing

---

[23] The Court notes the discrepancy between the $5700 amount noted earlier in the report, and the $5900 stated later, in the report's conclusions.

[24] Prior to commencing this action, Plaintiff filed a lawsuit in Queens County Supreme Court on December 26, 2013, containing many of the same allegations. (Decl. of Beth Hoffman in Supp. of Defs. Mot. ("Hoffman Decl.") ¶ 2 n.1, Docket Entry No. 64.) On June 5, 2015, the parties to the state court action entered into a stipulation to discontinue that action and refile in federal court. (*Id.*)

bogus summonses, re-arresting and putting Plaintiff through the system, taking Plaintiff's gun, taking Plaintiff's gun license, and not returning the gun or license even though the charges were dropped." (Am. Compl. ¶¶ 197–202.) Plaintiff asserts that these acts were in retaliation for her "protected activities while employed by the NYPD," including her internal complaints and lawsuits against the NYPD.[25] (*Id.* ¶ 194.)

Second, Plaintiff asserts a section 1983 selective enforcement claim against Defendants Larosa, Leguernic, Xerri, Starrantino, King, Calderon, and Shafidiya, based on the NYPD's alleged practice of "conducting raids on a bar frequented by African-Americans (based on racial discrimination) while leaving other bars (and bar owners) alone." (*Id.* ¶¶ 205–20.) Plaintiff asserts that the NYPD conducted such "raids" "under the pretext of the ABC Laws to oppress, harass, and ruin Plaintiff's business." (*Id.* ¶ 210.)

Third, Plaintiff asserts a section 1983 claim for false arrest and false imprisonment against Defendants Larosa, Leguernic, Xerri, Starrantino, King, Xerri, and Calderon, alleging that the officers falsely arrested her on September 29, 2012 "without consent, justification, privilege, or probable cause . . . ." (*Id.* ¶¶ 221–38.)

Fourth, Plaintiff brings a section 1983 claim for illegal searches against Defendants Larosa, Leguernic, Xerri, Starrantino, King, Calderon, and Shafidiya, alleging that the officers "did not have a valid warrant" or other justification to search the lounge on August 24, 2012, August 27, 2012, September 29, 2012, December 14, 2012, or December 22, 2013, and did so

---

[25] Individuals are not subject to liability under Title VII. *Cayemittes v. City of New York Dep't of Hous. Pres. & Dev.*, 641 F. App'x 60, 61–62 (2d Cir. 2016) ("Title VII does not provide for individual liability." (first citing *Raspardo v. Carlone*, 770 F.3d 97, 113 (2d Cir. 2014); and then citing *Spiegel v. Schulmann*, 604 F.3d 72, 79 (2d Cir. 2010) (per curiam))); *Caesar v. Riverbay Corp.*, No. 15-CV-8911, 2017 WL 6887597, at *4 n.7 (S.D.N.Y. Dec. 27, 2017). Plaintiff withdrew this claim in her opposition brief. (Pl. Opp'n 16 n.15.) Accordingly, the Court dismisses Plaintiff's Title VII retaliation claim.

"in bad faith." (*Id.* ¶¶ 239–74.)

Fifth, Plaintiff asserts a section 1983 claim for illegal seizure against Defendants Lunetta, Brewster, Larosa, Leguernic, and Starrantino, alleging that the NYPD (1) wrongfully suspended her firearm license and confiscated her weapons, and (2) improperly removed and damaged items in the lounge's premises on September 29, 2012. (*Id.* ¶¶ 275–88.)

Sixth, Plaintiff asserts a section 1983 claim against Defendants Larosa, Leguernic, Xerri, Starrantino, King, Calderon, Shafidiya, Lunetta and Brewster, based on various alleged failures to intervene against the violation of Plaintiff's rights (1) during her arrest on September 29, 2012, (2) searches of Onyxx Lounge "without a warrant or other justification," and (3) suspension of her firearm license and confiscation of her firearms. (*Id.* ¶¶ 289–302.)

Seventh, Plaintiff asserts a claim for municipal liability under *Monell* against the City of New York, based on the NYPD Pistol Licensing Division's "*de facto* polic[y]" of "cancelling" firearm permits and licenses "for ex-NYPD officers with whom NYPD officials are disgruntled." (*Id.* ¶¶ 303–13.)

Plaintiff seeks compensatory damages, punitive damages, injunctive relief,[26] and

---

[26] Although Plaintiff seeks injunctive relief as to the suspension of her firearm license and confiscation of her weapons, (Am. Compl. 40 (prayer for relief)), the parties agree that Plaintiff's license has been reinstated and her firearms have been returned to her, (*see* Defs. 56.1 ¶¶ 141–42; Pl. Resp. ¶¶ 141–42). The Court therefore denies this request as moot, *see Williams v. Annucci*, 895 F.3d 180, 187 (2d Cir. 2018) ("A case is deemed moot where the problem sought to be remedied has ceased, and where there is no reasonable expectation that the wrong will be repeated." (quoting *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996))); *see also Dean v. Blumenthal*, 577 F.3d 60, 66 (2d Cir. 2009) (even when an entire case is not moot, specific requests for, *inter alia*, injunctive relief may be deemed moot). The Court is "mindful that even though neither party has raised the issue of mootness[,] . . . mootness is a jurisdictional question, and thus [the Court] must examine the issue *sua sponte* when it emerges from the record." *Winston v. City of Syracuse*, 887 F.3d 553, 558 n.3 (2d Cir. 2018) (alteration and internal quotation marks omitted) (quoting *Muhammad v. City of N.Y. Dep't of Corr.*, 126 F.3d 119, 122 (2d Cir. 1997))).

attorneys' fees and costs.

### ii. The parties' cross-motions for summary judgment

The parties filed cross-motions for summary judgment. Defendants move for summary judgment as to all of Plaintiff's claims. Plaintiff cross-moves for partial summary judgment as to her claim for false arrest and false imprisonment.[27] (Pl. Mem. 2.)

### iii. Plaintiff's motion to amend

Shortly after filing her cross-motion for partial summary judgment, Plaintiff filed a pre-motion conference letter seeking leave to file a second amended complaint adding an additional *Monell* claim against the City of New York. (Pl. Pre-motion Conference Letter dated Oct. 30, 2017, Docket Entry No. 84.) Plaintiff asserts that NYPD officers issued her summonses on September 29, 2012 and December 14, 2012 for unreasonable noise, "but they did not use a sound meter to measure decibel levels, which is mandated by statute." (*Id.* at 1.) Plaintiff further asserts that the NYPD "teaches its officers to issue these patently illegal summonses with deliberate indifference . . . ." (*Id.*) Defendants filed a letter on November 8, 2017 opposing "any effort by Plaintiff to amend the Amended Complaint as untimely." (Defs. Letter dated Nov. 8, 2017, Docket Entry No. 85.)

---

[27]  Plaintiff also appears to seek summary judgment on claims arising from the alleged December 14, 2013 "shut down" of Onyxx Lounge. (*See* Pl. Mem. 16.) However, Plaintiff acknowledges that the Amended Complaint does not include allegations of a December 14, 2013 incident, (*see* Pl. Mem. 6 n.6 (stating that the Amended Complaint does not contain allegations relating to the alleged December 14, 2013 incidents because "[d]efense counsel provided the name of the defendant [who was assigned as midnight patrol sergeant that night] on May 20, 2017, after the parties submitted their applications for a pre-motion conference")). The Court therefore declines to consider Plaintiff's claim stemming from the alleged December 14, 2013 events. Moreover, Plaintiff fails to provide any evidence of such incident other than an unsigned police action form indicating that officers inspected Onyxx Lounge and "shut down" the party. (Police Action Form, annexed to Marino Decl. as Ex. 5, Docket Entry No. 72-5.)

The Court subsequently directed the parties to submit further briefing on their respective positions regarding Plaintiff's motion to amend. (Order dated Nov. 13, 2017.) The parties completed their briefings on January 12, 2018. (*See* Defs. Letter dated Dec. 19, 2017, Docket Entry No. 88; Pl. Mot. to Amend; Defs. Letter dated Jan. 12, 2018, Docket Entry No. 92.)

## II. Discussion

### a. Standards of review

#### i. Summary judgment

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### ii.  Motion to amend

The Federal Rules of Civil Procedure provide that courts "should freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2).  The Second Circuit has stated that "[t]his permissive standard is consistent with our strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011) (citation omitted).  Leave to amend should be given "absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Couloute v. Ryncarz*, No. 11-CV-5986, 2012 WL 541089, at *3 (S.D.N.Y. Feb. 17, 2012) (quoting *Monahan*, 214 F.3d at 283).

### b.  Section 1983 — selective enforcement claim

Plaintiff's selective enforcement claim is grounded in the Fourteenth Amendment's guarantee of equal protection.  Plaintiff asserts that Defendants Larosa, Leguernic, Xerri, Starrantino, King, Calderon and Shafidiya conducted "raids" at Onyxx Lounge because it was frequented and owned by African Americans.  (Am. Compl. ¶¶ 205–20.)  Defendants assert that Plaintiff has failed to present evidence supporting her claim.  (Defs. Mem. 19–20.)

"The Fourteenth Amendment to the United States Constitution declares that 'no State shall . . . deny to any person within its jurisdiction the equal protection of the laws.'" *Brown v. City of Oneonta, New York*, 221 F.3d 329, 336–37 (2d Cir. 2000) (quoting U.S. Const. amend. XIV, § 1)).  The equal protection clause prohibits government officials from intentionally discriminating against individuals based on their race, ethnicity, gender or national origin.[28]  *See*

---

[28]  The equal protection clause also prohibits certain discrimination against plaintiffs who are not members of a protected class. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994).

*Ross v. New Canaan Envtl. Comm'n*, 532 F. App'x 12 (2d Cir. 2013) ("To state a claim for an

equal protection violation, appellants must allege that a government actor intentionally

discriminated against them on the basis of race, national origin or gender." (quoting *Hayden v.*

*Cty. of Nassau*, 180 F.3d 42, 48–49 (2d Cir. 1999))); *see also Hayden v. Paterson*, 594 F.3d 150,

162 (2d Cir. 2010) ("The central purpose of the Equal Protection Clause of the Fourteenth

Amendment is the prevention of official conduct discriminating on the basis of race." (quoting

*Washington v. Davis*, 426 U.S. 229, 239 (1976))).

Where a plaintiff is treated unequally compared with others similarly situated, and when

such treatment is based on "impermissible considerations" such as race or religion, the facts give

rise to a claim of selective enforcement. *LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester*,

40 F.3d 587, 590 (2d Cir. 1994); *see also Martine's Serv. Ctr., Inc. v. Town of Wallkill*, 554 F.

App'x 32, 35 (2d Cir. 2014). Similarly, equal protection claims based on a so-called "class of

one" theory involve claims "where the plaintiff alleges that she has been intentionally treated

differently from others similarly situated and that there is no rational basis for the difference in

treatment."[29] *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (first citing *Sioux City*

---

[29] A plaintiff may also assert equal protection claims based on "selective enforcement" or
"class of one" theories when the alleged discrimination is not based on the plaintiff's
membership in a protected class. *See Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499
(2d Cir. 2001) (distinguishing the "prototypical equal protection claim [which] involves
discrimination against people based on their membership in a vulnerable class" from selective
enforcement claims, which involve "individuals who allege no specific class membership but are
nonetheless subjected to invidious discrimination at the hands of government officials" (citing
*LeClair v. Saunders*, 627 F.2d 606, 608–10 (2d Cir. 1980))); *see also Vill. of Willowbrook v.*
*Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074 (2000) ("Our cases have recognized successful
equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been
intentionally treated differently from others similarly situated and that there is no rational basis
for the difference in treatment." (first citing *Sioux City Bridge Co. v. Dakota Cty.*, 260 U.S. 441
(1923); and then citing *Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty.*, 488 U.S.
336 (1989))); *DePrima v. City of New York Dep't of Educ.*, No. 12-CV-3626, 2014 WL 1155282,

*Bridge Co. v. Dakota Cty.*, 260 U.S. 441 (1923); and then citing *Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty.*, 488 U.S. 336 (1989)).  A plaintiff asserting a selective enforcement or class of one claim must present evidence of similarly situated comparators.  *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004) ("A selective enforcement claim requires, as a threshold matter, a showing that the plaintiff was treated differently compared to others similarly situated." (citing *Giordano v. City of New York,* 274 F.3d 740, 750–51 (2d Cir. 2001))); *see also King v. N.Y. State Div. of Parole*, 260 F. App'x 375, 380 (2d Cir. 2008) (affirming dismissal of class of one claim because the plaintiff "failed to identify a single individual with whom he can be compared for Equal Protection purposes").

In addition to selective enforcement and class of one claims, "[t]here are several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause." *Brown*, 221 F.3d at 337.  To sustain an equal protection claim, a plaintiff may also rely on (1) a law that makes classifications specifically based on a protected class, including race, (2) a facially neutral law or policy that has been applied in a discriminatory manner, or (3) a facially neutral policy that has an adverse effect and was motivated by discriminatory animus.  *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001).  Unlike selective enforcement and class of one claims, these theories do not require the identification of similarly situated comparators.  *Pyke*, 258 F.3d at 108–09 ("A plaintiff alleging an equal protection claim under a theory of discriminatory application of the law, or under a theory of discriminatory motivation underlying a facially neutral policy or statute,  generally need not plead or show the disparate treatment of other similarly situated

---

at *6 (E.D.N.Y. Mar. 20, 2014) ("Absent membership in a 'suspect class,' such as race or national origin, any individualized harm committed by a[] [state actor] in violation of the Equal Protection Clause is properly recognized as either a class of one and/or selective treatment claim . . . ." (citations omitted)).

individuals."); *Brown*, 221 F.3d at 337 ("Plaintiffs are correct . . . that it is not necessary to plead the existence of a similarly situated non-minority group when challenging a law or policy that contains an express, racial classification.").

### i.     Overlapping equal protection theories

Given the obvious overlap between cases where the law has been selectively enforced (a theory which requires a plaintiff to present comparator evidence), and cases where a facially neutral law has been applied in a discriminatory manner (a theory which does not require comparator evidence), some courts have distinguished these two theories by identifying a selective enforcement case as one where a plaintiff challenges the defendant's application of the law *as enforced against the plaintiff*, as opposed to a "discriminatory application" case, where the law is applied in some other discriminatory manner. *See White v. City of New York*, 206 F. Supp. 3d 920, 930–31 (S.D.N.Y. 2016) (finding that "[t]he plaintiff's claim is not that he was singled out as a target against whom the law was enforced" and the plaintiff was therefore not pursuing a theory of selective enforcement, "obviat[ing] the need for [him] to plead similarly situated comparators"); *see also Patterson v. City of New York*, No. 16-CV-3525, 2017 WL 3432718, at *9 (E.D.N.Y. Aug. 9, 2017) (drawing the same distinction as *White* to differentiate between selective prosecution claims and claims implicating "the more general framework for discriminatory application of the law" (internal quotation marks omitted)), *appeal dismissed*, No. 17-2586, 2017 WL 7734129 (2d Cir. Nov. 21, 2017).   Other courts have considered both selective enforcement and "discriminatory application of a facially neutral law" theories in the alternative, and have considered the "discriminatory application" theory notwithstanding the fact that the plaintiff was challenging a law or policy that was in fact applied as against them. *See Janfeshan v. U.S. Customs & Border Prot.*, No. 16-CV-6915, 2017 WL 3972461, at *10–11

(E.D.N.Y. Aug. 21, 2017) (considering alternative theories of discriminatory application of facially neutral law and selective enforcement in case where the plaintiff alleged that U.S. Customs and Border Protection, acting pursuant to a neutral policy, searched his electronic device because he was Muslim); *Savino v. Town of Se.*, 983 F. Supp. 2d 293, 302 (S.D.N.Y. 2013) (considering alternative theories of discriminatory application of a facially neutral law and selective enforcement based on the defendants' enforcement of zoning laws against the plaintiff), *aff'd*, 572 F. App'x 15 (2d Cir. 2014).  Moreover, the Second Circuit has expressly stated that a plaintiff may pursue both theories in the alternative, further suggesting that facts giving rise to a selective enforcement theory do not preclude consideration of the theory that a "facially neutral law was applied in a discriminatory manner."  *See Rodriguez v. Clinton*, 357 F. App'x 355, 357 (2d Cir. 2009) (noting that the plaintiff may pursue an equal protection claim on a theory of selective enforcement, or "[i]n the alternative, he could pursue an 'equal protection claim under a theory of discriminatory application of the law'" (quoting *Pyke*, 258 F.3d at 108–09)).

Although Plaintiff expressly proceeds on a theory of selective enforcement, and neither party has addressed the applicability of other equal protection theories, Plaintiff's claim implicates theories of both selective enforcement and the discriminatory application of the A.B.C. Law.  Plaintiff alleges that the A.B.C. Law, a "facially neutral law," has been used to discriminate against her and her patrons on the basis of their race and because of Plaintiff's contentious history with the NYPD.  (*See* Am. Compl. ¶¶ 205–20.)  The Court therefore considers Plaintiff's claim under both the selective enforcement framework and the framework used for cases involving a facially neutral law that has been applied in an unlawfully or discriminatory manner.  *See White*, 206 F. Supp. 3d at 930 ("Defendants have characterized [the plaintiff's] equal protection claim as a selective enforcement claim, and [the plaintiff] has not

contested that categorization. Although the parties have approached the equal protection claim through this lens, the [c]ourt does not view [the plaintiff's] claim as a selective enforcement claim, which obviates the need for [the plaintiff] to plead similarly situated comparators."); *Casciani v. Nesbitt*, 659 F. Supp. 2d 427, 436 (W.D.N.Y. 2009) ("Because it is not clear that plaintiff has limited himself to a selective-enforcement theory, and since there is some conceptual overlap between these various theories, both generally and in the factual context of this case, the [c]ourt will consider and address whether plaintiff has presented a viable equal protection claim under any theory."), *aff'd*, 392 F. App'x 887 (2d Cir. 2010); *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 544–46 (S.D.N.Y. 2006) (although allegations did "indeed smack of 'selective enforcement' as one possible theory under which to adjudicate the plaintiffs' claims," rejecting the defendants' argument that the plaintiffs could not also invoke the theory that a "facially neutral law or policy [was] applied in an intentionally discriminatory manner," and considering both theories).

ii.    **Selective enforcement analysis**

Plaintiff argues that the NYPD's enforcement practices with regard to sixteen other licensed businesses located in the 110th Precinct demonstrates selective treatment of Onyxx Lounge. (Pl. Opp'n 16–18.) She asserts that these sixteen businesses are similarly situated "comparators," because they are "all licensed premises, located in the 110th Precinct," they all "received summonses (or other police action) . . . during SLA inspections from 2011–2013," and "are each subject to the SLA's unique regulatory scheme enforced by the NYPD . . . ." (*Id.* at 17.) Comparing Onyxx Lounge to these sixteen purported comparators, Plaintiff presents the following data:

|                                  | Ms. Glover/Onyxx Lounge | 16 Comparators (Combined) |
|----------------------------------|:------------------------:|:--------------------------:|
| Summonses (2011–2013)            | 14                       | 50                         |
| Summonses (2011)                 | 0                        | 10                         |
| Summonses (2012)                 | 14                       | 20                         |
| Summonses (2013)                 | 0                        | 20                         |
| Arrests/Owners (2011–2013)       | 1                        | 0                          |
| Arrests/Patrons (2011–2013)      | 3                        | 5                          |
| Shutdowns (2011–2013)            | 3                        | 1                          |

(*Id.* at 19.)  Plaintiff argues that this data supports her claim because it shows that the NYPD:

> did not arrest a single owner or manager from 2011–2013, even though they could have arrested three of them for selling alcohol to minors.  See NYPL § 260.20(2).  They arrested only five of the [c]omparators' patrons in three years, and they shut down only one establishment in coordination with an outside agency.

(*Id.*; *see* also *id.* at 11–12, 20 (making similar arguments).)

Defendants argue that this data does not establish that such comparators are similarly situated to Onyxx Lounge.  Defendants contend that the police action forms from which Plaintiff obtained the data lack detail and do not reflect "which establishments engaged live entertainment, until which hour they played music, if they were located in a more commercial or residential area as compared to [P]laintiff's bar," and "how many of the inspections of those establishments had been instigated by a civilian complaint call."[30]  (Defs. Reply 3.)  In response to Plaintiff's argument that NYPD officers declined to arrest owners or managers of the comparators for selling alcohol to minors, Defendants contend that this observation "arguably reveals more similarities than differences in the Defendants' SLA enforcement practices,"

---

[30]  By letter dated September 28, 2017, Defendants withdrew their arguments that Plaintiff has not explained how she selected the sixteen comparators from the information produced by Defendants, the criteria used to identify them, or why the comparators are similarly situated.  (Defs. Reply 2–3; Defs. Letter dated Sept. 28, 2017, Docket Entry No. 81.)  However, Defendants maintain that Plaintiff has not provided information necessary to establish that such comparators are similarly situated.

because it is consistent with Shafidiya's alleged decision on August 27, 2012 to "use[] her discretion" to warn Plaintiff for observed underage drinking at Onyxx Lounge rather than arrest Plaintiff for the offense.  (*Id.* at 4.)  Finally, in their reply brief, Defendants separately argue that King and Starrantino were not personally involved in the conduct giving rise to this claim.[31]  (*Id.* at 14.)

To prevail on a claim for selective enforcement of the law in violation of the Equal Protection Clause, a plaintiff must prove that (1) "compared with others similarly situated, [the plaintiff] was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure [the

---

[31]  The parties' briefs confusingly raise new and different arguments that the Court summarizes here for purposes of clarity.  Defendants argued in their moving brief that "all Defendants are entitled to qualified immunity on certain of Plaintiff's claims," but subsequently only identified certain Defendants and certain claims that they believe should be precluded by qualified immunity.  (Defs. Mem. 24.)  Specifically, Defendants argued that "[e]ven if the Court were to [deny] summary judgment on [P]laintiff's claims of illegal searches, false arrest/false imprisonment, illegal seizures, and failure to intervene, as against defendants Larosa, Leguernic, Xerri, Starrantino, King, Lunetta, Brewster, Calderon, and Shafidiya," Defendants would "nevertheless [be] entitled to qualified immunity on the specific claims for which they are named," but never mention Plaintiff's equal protection claim.  (*Id.* at 24–26.)

In responding to Plaintiff's opposition argument that King and Starrantino are liable for false arrest "under the theory of supervisory liability, as they were involved in verifying the arrest either as the supervisor on the scene (Starrantino) or as the officer operating the desk (King)," (Pl. Opp'n 21 (citing *Colon v. Coughlin*, 58 F. 3d 865, 873 (2d Cir. 1995)), Defendants argue for the first time in their reply that Plaintiff cannot maintain her false arrest *and* equal protection claims against King or Starrantino because neither were personally involved in the conduct giving rise to these claims.  (*See* Defs. Reply 13–14.)  Defendants also argued in their reply that King and Starrantino are entitled to qualified immunity for Plaintiff's arrest because "there is no evidence that either named defendant believed [P]laintiff's arrest to be anything other than lawful and rooted in probable cause."  (*Id.* at 14–15.)

Based on the foregoing, the Court will consider Defendants' belated argument that King and Starrantino were not personally involved in the conduct giving rise to Plaintiff's equal protection and false arrest claims.  In addition, to the extent the Court concludes that Plaintiff has raised a disputed issue of material fact precluding summary judgment as to any of her claims, the Court will address whether Defendants are entitled to qualified immunity as to those claims.

plaintiff]." *Martine's Serv. Ctr., Inc. v. Town of Wallkill*, 554 F. App'x 32, 35 (2d Cir. 2014)

(quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)); *see Mosdos Chofetz*

*Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 698 (S.D.N.Y. 2011) (noting that in

order to satisfactorily state a selective enforcement claim, the court must determine, based on the

allegations in the operative complaint, whether it is plausible that a reasonable jury could

ultimately conclude that the plaintiff is similarly situated to an alleged comparator).

"'A showing that the plaintiff was treated differently compared to others similarly

situated' is a 'prerequisite' and a 'threshold matter' to a selective enforcement claim." *Bey v. City*

*of New York*, 210 F. App'x 50, 53 (2d Cir. 2006) (quoting *Church of the Am. Knights of the*

*KKK*, 356 F.3d at 210)). This showing requires a plaintiff to establish both the existence of

comparators who are similarly situated, and differential treatment from such comparators. *See*

*Church of Am. Knights of the Ku Klux Klan*, 356 F.3d at 210 (describing showing of "similarly

situated" comparators as a "threshold" requirement, and showing of "differential treatment" as "a

prerequisite to selective enforcement").

Generally, to establish differential treatment, a plaintiff must demonstrate that the

defendant had knowledge of violations committed by others, but declined to enforce them. *See*

*LaTrieste Rest. v. Vill. of Port Chester*, 188 F.3d 65, 70 (2d Cir. 1999) ("[S]elective prosecution

implies that a selection has taken place." (quoting *United States v. Armstrong,* 517 U.S. 456, 469

(1996))). "Absent a showing that the [defendant] knew of other violations, but declined to

prosecute them, [a plaintiff] would ordinarily be unable to show that it was treated selectively."

*Id.* (quoting *Armstrong*, 517 U.S. at 470); *see also Savino*, 983 F. Supp. 2d at 306 (a

demonstration that a plaintiff was treated differently from comparators "often requires evidence

of 'the municipality's knowledge of the other, unenforced violations' committed by the

comparators" (quoting *Christian v. Town of Riga,* 649 F. Supp. 2d 84, 94 (W.D.N.Y.

2009))), *aff'd*, 572 F. App'x 15 (2d Cir. 2014); *Sherwyn Toppin Mktg. Consultants, Inc. v. City of

New York*, No. 08-CV-1340, 2013 WL 685382, at *12 (E.D.N.Y. Feb. 25, 2013) (dismissing

selective enforcement claim brought by plaintiff alleging racially discriminatory enforcement of

A.B.C. Law because the plaintiff "failed to come forward with evidence that similar businesses .

. . engaged in the same conduct [but] were not prosecuted"); *Mangino v. Inc. Vill. of Patchogue*,

739 F. Supp. 2d 205, 254 (E.D.N.Y. 2010) ("Here, plaintiffs' burden is to demonstrate that other

residents who were issued tickets for, *e.g.,* lack of a rental permit, continued to not comply with

the law at issue, *e.g.,* the rental permit law, but did not receive subsequent summonses for their

continued non-compliance."), *on reconsideration in part*, 814 F. Supp. 2d 242 (E.D.N.Y. 2011);

*Spinks v. Orleans Cty.*, No. 10-CV-745, 2011 WL 2491001, at *7 (W.D.N.Y. June 22, 2011)

("Selective treatment by a governmental entity implies some sort of conscious decision to take

action against some people but not others against whom the same action could be taken.").

Plaintiff has not demonstrated that she was treated differently from her comparators, and

therefore fails to establish a claim for selective enforcement.[32]  Plaintiff's data and

_____

[32]  The Court assumes for purposes of its analysis that the comparators are "similarly situated," although, at least with regard to Plaintiff's assertion that the selective enforcement was based on her race and the race of her patrons, her failure to identify the race of the owners, managers, and patrons of the comparators is fatal to her theory.  *See Savino v. Town of Southeast*, 983 F. Supp. 2d 293, 305 (S.D.N.Y. 2013) ("Because Plaintiffs assert selective enforcement based on national origin, they must identify similarly situated property owners who are not of [the plaintiff-owner's] national origin." (citing *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 696 (S.D.N.Y. 2011))), *aff'd*, 572 F. App'x 15 (2d Cir. 2014); *Sherwyn Toppin Mktg. Consultants, Inc. v. City of New York*, No. 08-CV-1340, 2013 WL 685382, at *12 (E.D.N.Y. Feb. 25, 2013) (finding that the deposition testimony cited by the plaintiff "contains no testimony regarding the race or national origin of the *owners* or *operators* of any club, including [the establishment the plaintiffs claimed was selectively enforced]"); *Anderson v. City of New York*, 817 F. Supp. 2d 77, 94 (E.D.N.Y. 2011) ("Regardless of the meaning of 'similarly situated,' if a plaintiff attempts to prove selective enforcement prosecution based

accompanying arguments rely almost exclusively on the fact that Onyxx Lounge has been the subject of a disproportionate amount of enforcement action by the NYPD. However, more is required to sustain a selective enforcement claim. Plaintiff must present evidence that the comparators engaged in violations that the NYPD did not enforce. *See LaTrieste Rest.*, 188 F.3d at 70; *see also Sherwyn Toppin Mktg. Consultants, Inc.*, 2013 WL 685382, at *12; *Spinks*, 2011 WL 2491001, at *7; *Mangino*, 739 F. Supp. 2d at 254. The mere fact that other businesses fall within the jurisdiction of the 110th Precinct, are covered by the SLA regulatory regime, and are subject to less enforcement activity than Plaintiff's business does not demonstrate that these businesses were in violation of laws and that the NYPD declined to enforce the violations, a necessary component of Plaintiff's claim.[33]

Plaintiff's observation that the NYPD — in enforcing violations for the sale of alcohol to minors against three of the alleged comparators — issued summonses pursuant to the A.B.C.

---

on race, he must demonstrate that 'similarly situated individuals of a different race were not subjected to the offensive conduct.'" (alteration omitted) (quoting *Vassallo v. Lando*, 591 F. Supp. 2d 172, 184 (E.D.N.Y. 2008))). In addition to alleging that the selective enforcement was motivated by race, Plaintiff also alleges that the officers' conduct was based on her contentious history with the NYPD. While it is unclear whether, in order to proceed on the latter theory, Plaintiff would need to make an affirmative showing that the comparators did *not* share a similar history with the police, the Court need not resolve this issue in light of its conclusion that Plaintiff has not shown selective treatment.

[33] Plaintiff also cites to *Gem Financial Services, Inc. v. City of New York*, No. 13-CV-1686, 2015 WL 1475853 (E.D.N.Y. Mar. 31, 2015), where this Court found that the plaintiff adequately alleged a similarly situated comparator, which was, *inter alia*, "subject to the same unique regulatory scheme enforced by the NYPD" as the plaintiff. *Gem Fin. Servs.*, 2015 WL 1475853, at *8. Relying on *Gem*, Plaintiff argues that the sixteen alleged comparators she points to are similarly situated, because, like the comparator in *Gem*, they are "subject to the same unique regulatory scheme" as Onyxx Lounge. (Pl. Opp'n 17 (quoting *Gem Fin. Servs.*, 2015 WL 1475853, at *8).) However, *Gem* does not support Plaintiff's selective enforcement claim because, as discussed *supra* n.32, the Court is assuming that Plaintiff's sixteen comparators are similarly situated; Plaintiff's claim fails because Plaintiff has not shown that she was subject to selective treatment.

Law, instead of making arrests pursuant to the Penal Law, (Pl. Opp'n 19), also fails to support her selective enforcement claim, as these actions are consistent with evidence in the record regarding the NYPD's enforcement practices.[34]  According to the A.B.C. Manual for New York State Law Enforcement Officials (the "A.B.C. Manual"), when enforcing this conduct against "[a] licensee or his employee," NYPD officers apply section 65 of the A.B.C. Law, and not section 260.20(2) of the New York Penal Law.  (*See* A.B.C. Manual 5–6, annexed to Hoffman Decl. as Ex. M, Docket Entry No. 64-13.)  The A.B.C. Manual specifies that use of the Penal Law is "generally confined to situations where there is no involvement of the licensee or his employee."  (*Id.* at 6.)  Therefore, the NYPD's decision to issue summonses to the three business owners under section 65(1) of the A.B.C. Law, rather than arrest them pursuant to N.Y.P.L. § 260.20(2), is consistent with its enforcement practices as set forth in the A.B.C. Manual.  While the Court acknowledges some lack of clarity as to whether the NYPD was nevertheless authorized to make arrests pursuant to section 65(1) of the A.B.C. Law,[35] Plaintiff makes no such

---

[34]  Section 65 of the A.B.C. Law states in relevant part that "[n]o person shall sell, deliver or give away or cause or permit or procure to be sold, delivered or given away any alcoholic beverages to . . . . [a]ny person, actually or apparently, under the age of twenty-one years."  N.Y. Alco. Bev. Cont. Law § 65(1).

[35]  The Court notes that pursuant to section 130(3) of the A.B.C. Law, "[a]ny violation by any person of any provision of this chapter for which no punishment or penalty is otherwise provided shall be a misdemeanor."  N.Y. Alco. Bev. Cont. Law § 130(3); *see also Swedenburg v. Kelly*, 232 F. Supp. 2d 135, 137 (S.D.N.Y. 2002) ("Section 130(3) makes violation of the N.Y. ABC Law a misdemeanor."), *aff'd in part*, *rev'd in part and remanded*, 358 F.3d 223 (2d Cir. 2004), *rev'd sub nom. Granholm v. Heald*, 544 U.S. 460 (2005).  Moreover, the State Liquor Authority Manual for Law Enforcement, another resource used in training NYPD officers, states that "[a] sale to a minor is considered one of the most serious violations" of the A.B.C. Law.  (State Liquor Authority Manual, annexed to Hoffman Decl. as Ex. P, Docket Entry No. 64-16.)  However, other evidence in the record indicates that as a matter of practice, NYPD officers are not trained to arrest for violations of section 65(1) of the A.B.C. Law.  For example,

argument, and — consistent with the testimony of Officer Starrantino[36] — affirmatively asserts in her briefing that "violations of the ABC Laws do not give officers the authority to make an arrest . . . ." (Pl. Opp'n 21.) Accordingly, the Court finds that the relevant violations cited by Plaintiff fail to satisfy the first element of a selective enforcement claim. Plaintiff therefore fails to establish that she or Onyxx Lounge was the subject of selective treatment.[37]

For the foregoing reasons, Plaintiff cannot sustain her equal protection claim based on a theory of selective enforcement.

### iii. Facially neutral law or policy applied in an unlawfully or discriminatory manner

Defendants argue that Plaintiff's equal protection claim fails for the independent reason

---

the record contains a copy of another NYPD training module entitled "Conducting Business Inspections — Cabaret/Social Club Enforcement." (Conducting Business Inspections Training Module, annexed to Hoffman Decl. as Ex. N, Docket Entry No. 64-14.) The module includes a a Powerpoint presentation with a slide listing "Common Violations When Conducting Business Inspections." (*Id.* at 10.) The presentation lists "Sale of Alcohol to Minors" as a violation of section 65(1), and notes "Enforcement Action is a Summons." (*Id.*) Another slide in the same presentation entitled "Sample Business Inspection Checklist" contains a chart reflecting various violations of the A.B.C. Law and the corresponding appropriate enforcement action, and identifies the issuance of a summons as the relevant enforcement action for the violation of section 65(1) of the A.B.C. Law. (*Id.* at 15–16.)

[36] (*See* Starrantino Dep. 136:8–21, annexed to Marino Dec. as Ex. 9, Docket Entry No. 72-9.)

[37] Plaintiff also argues that the NYPD's training materials suggest that officers should have issued Plaintiff a summons for permitting gambling under section 106.6 of the A.B.C. Law, and her arrest pursuant to the Penal Law therefore demonstrates selective treatment. (*See* Pl. Opp'n 21.) However, the referenced training materials, which enumerate a list of "common offenses," merely cite to section 106.6 of the A.B.C. Law in noting gambling as one such "common offense." (*See* NYPD Cabaret/Social Club Enforcement Training Materials, annexed to Hoffman Decl. as Ex. O, Docket Entry No. 64-15.) Unlike the A.B.C. Manual, these training materials do not specify when officers should act pursuant to the A.B.C. Law instead of the Penal Law when enforcing violations for gambling.

that she has not established Defendants' discriminatory intent.[38]  (Defs. Mem. 19.)  Defendants

assert that Plaintiff has "adduced zero evidence that [D]efendants' enforcement actions against

[Onyxx Lounge] were motivated by anything [other] than the results of SLA inspections

conducted as a result of civilian complaints," and in the case of the December 14, 2012

inspection, "a motivation to follow up on the infractions incurred by [Onyxx Lounge] on

September 29, 2012."  (Defs. Reply 6.)  Defendants further argue that:

> Malice and/or a racially discriminatory motivation for the
> enforcement action against [P]laintiff's bar cannot be established
> from [P]laintiff's allegations, even if assumed to be true, that
> Sergeant Starrantino twice used racially derogatory language when
> speaking to [P]laintiff, nor from [P]laintiff's allegation that
> Lieutenant Calderon stated that [P]laintiff was 'not welcome' in that
> neighborhood.

(*Id.* at 7.)

Plaintiff argues that the comments allegedly made by various NYPD officers, in addition

to the "bogus summonses" they issued, are sufficient to permit a rational fact-finder to conclude

that NYPD officers were motivated by discriminatory intent.  (Pl. Opp'n 18–19.)

"A law which is facially neutral violates equal protection if it is applied in a

discriminatory fashion."  *Jana-Rock Const., Inc. v. New York State Dep't of Econ. Dev.*, 438 F.3d

195, 204 (2d Cir. 2006) (alteration omitted) (quoting *Hayden v. Cty. of Nassau,* 180 F.3d 42, 48

(2d Cir. 1999))).  Although, as discussed above, a plaintiff proceeding under the theory that a

facially neutral law has been applied in a discriminatory manner need not present comparator

---

[38]  While the parties did not brief whether Plaintiff's equal protection claim may proceed
under a theory that rests on an alleged "discriminatory application of a facially neutral law," they
have briefed the second prong of the selective enforcement test, *i.e.*, whether the alleged
selective treatment was motivated by an intention to discriminate on the basis of impermissible
considerations, such as, among other things, race.  Because the issue is directly relevant to
whether Plaintiff can support a claim under the "discriminatory application" theory, the Court
considers those arguments in deciding this issue.

evidence, the plaintiff "will, of course, be required to substantiate [her] claim that [the defendants' conduct] was motivated by racial discrimination." *Pyke*, 258 F.3d at 110. "Plaintiffs challenging . . . facially neutral laws on equal protection grounds bear the burden of making out a prima facie case of discriminatory purpose." *Pyke v. Cuomo*, 567 F.3d 74, 78 (2d Cir. 2009) (citation and internal quotation marks omitted).

"Discriminatory purpose implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmakers[] . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Hayden*, 594 F.3d at 162–64 (alterations and internal quotation marks omitted) (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). However, to establish discriminatory purpose, "[a] plaintiff need not show . . . that a government decisionmaker was motivated solely, primarily, or even predominantly by concerns that were racial, for 'rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one.'" *United States v. City of Yonkers*, 96 F.3d 600, 611–12 (2d Cir. 1996) (alteration omitted) (quoting *Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). "Rather, the plaintiff need begin only by showing that race was '*a* motivating factor.'" *Id.* at 12 (quoting *Arlington Heights*, 429 U.S. at 266); *see also Collier v. Barnhart*, 473 F.3d 444, 448 (2d Cir. 2007) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause . . . but [*Washington v.*] *Davis*[, 426 U.S. 229 (1976)] does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes . . . . Courts must determine whether invidious discriminatory purpose was a motivating factor . . . ." (alterations omitted) (quoting *Arlington Heights*, 429 U.S.

at 265–66)); *see also Raza v. City of New York*, 998 F. Supp. 2d 70, 79 (E.D.N.Y. 2013) (discussing the "mixed motives" framework for equal protection claims and noting that "the existence of permissible motives does not preclude a finding that an impermissible discriminatory purpose was a factor in the government's actions"). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266.

"Once it is shown that a decision was motivated at least in part by a racially discriminatory purpose, the burden shifts to the defendant to show that the same result would have been reached even without consideration of race." *City of Yonkers*, 96 F.3d at 612 (first citing *Arlington Heights*, 429 U.S. at 265; and then citing *Mt. Health City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977))). "If the defendant comes forward with no such proof or if the trier of fact is unpersuaded that race did not contribute to the outcome of the decision, the equal protection claim is established." *Id.*

For the reasons discussed below, Plaintiff has presented sufficient evidence from which a reasonable fact-finder could conclude that racial bias was a motivating factor in the NYPD's enforcement of the A.B.C. Law against Onyxx Lounge, Plaintiff and her patrons.

### 1. Starrantino's derogatory comments

As discussed above, Plaintiff testified that during the December 14, 2012 search, Starrantino called her a "black b***h," threatened to "slap the sh*t out of [her] black a**," (Glover Dep. 107:3–16, annexed to Marino Opp'n Decl. as Ex. 1, Docket Entry No. 76-1), and told Plaintiff, "shut your black a** up before I lock you up," (Glover Dep. 236:18–23, annexed

to Marino Opp'n Decl. as Ex. 2, Docket Entry No. 76-2).[39]

In the employment context, the Second Circuit and district courts within this Circuit have frequently analyzed the probative value of derogatory remarks in determining whether a defendant acted with discriminatory intent by considering certain factors. *See Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (outlining four factors district courts in this circuit routinely consider in evaluating the probative value of such remarks, including (1) the identity and position of the individual making the remark, (2) the timing of the remark in relation to the employment decision, (3) the content of the remark, and (4) the context in which it was made); *Cherry v. New York City Hous. Auth.*, No. 15-CV-6949, 2017 WL 4357344, at *19 (E.D.N.Y. Sept. 29, 2017) (applying factors to evaluate whether workplace comments were probative of discriminatory intent).

The Second Circuit — and at least one district court — has implicitly found that consideration of these factors and related principles can be relevant in discrimination cases outside the employment context. *See Howard v. City of New York*, 602 F. App'x 545, 547 (2d

---

[39] The other derogatory comments Plaintiff alleges are not probative of racial bias and therefore not relevant to this analysis. (*See, e.g.* Pl. Statement of Additional Material Facts ¶ 168 (alleging that Plaintiff was called a "rat" in light of her history of complaints against the NYPD; *id.* ¶ 204 (alleging that on September 29, 2012, Starrantino said, referring to Plaintiff, "[t]hat is that b***h right there").) In addition, some of the evidence Plaintiff relies on is either insufficient to support a finding of discriminatory intent, or lacks support in the record. First, Plaintiff's allegations that the officers issued "bogus summonses" are not probative of the officers' racial animus. *See Howard v. City of New York*, 602 F. App'x 545, 548 (2d Cir. 2015) ("In sum, [the plaintiff] has done little more than cite to his alleged mistreatment and ask the court to conclude that 'it must have been related to [his] race. This is not sufficient."). Second, Plaintiff's assertion that Calderon told [Plaintiff she] 'was not welcome in that community and that he was going to make sure that [Onyxx Lounge] shut down and before [she] knew it [Onyxx lounge] would be a bodega,'" (Pl. Statement of Additional Material Facts ¶ 241), is not reflected in the portion of Calderon's testimony that Plaintiff cites. (*See* Calderon Dep. 53:17–54:22, annexed to Marino Opp'n Decl. as Ex. 32, Docket Entry No. 76-32.) These assertions therefore cannot support Plaintiff's claim of discriminatory purpose and the Court does not consider them in making its determination.

Cir. 2015) (considering derogatory comment in equal protection case, and citing employment discrimination case for the proposition that "remarks by someone other than [the] decision maker 'may have little tendency to show that the decision-maker was motived by the discriminatory sentiment expressed in the remark'" (quoting *Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 115 (2d Cir. 2007))); *Savino*, 983 F. Supp. 2d at 302 (equal protection case citing employment discrimination cases in evaluating the probative value of discriminatory comment). The Court therefore considers the factors cited in *Henry*, as applied by district courts, in analyzing the probative value of Starrantino's remarks.

When considering who uttered the remark at issue, courts ask whether the individual making the remark was also the one who decided, or influenced the decision, to commit the conduct that allegedly violated the plaintiff's rights. *See Owens v. N.Y.C. Hous. Auth.*, 934 F.2d 405, 410 (2d Cir. 1991) (holding that discriminatory remarks by "individuals with substantial influence over [the plaintiff's] employment" are relevant in determining whether an employment decision was motivated by discriminatory animus); *McCall v. Genpak, LLC*, No. 13-CV-1947, 2015 WL 5730352, at *14 (S.D.N.Y. Sept. 30, 2015) (finding that the person who demoted the plaintiff was the decisionmaker).

As to the timing of the remark, there is no bright line rule regarding the length of time that renders an allegedly discriminatory remark too attenuated to constitute evidence of discrimination. *See Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 34 (E.D.N.Y. 2015). However, remarks made closer in time to the allegedly discriminatory act are more likely to be probative of discrimination. *See id.*

Considering the content of the remarks, district courts have found that where the remark mentions or alludes to a protected status or class, it weighs in favor of finding the remarks

probative of discrimination. *See McCall*, 2015 WL 5730352, at *14 (finding that a reasonable juror could view the remark as discriminatory where decisionmakers saw the plaintiff wearing a bandana on his head while he was working, and she called him "Aunt Jemima"); *Richmond v. Gen. Nutrition Cntrs. Inc.*, No. 08-CV-3577, 2011 WL 2493527, at *3, *11 (S.D.N.Y. June 22, 2011) (finding that where the defendant told the plaintiff to "Go back to Africa," criticized his accent, and advised him that he was being demoted because an African should not be in his position, the defendant had made "racially charged comments" supporting the plaintiff's disparate treatment claim); *McCalla*, 2017 WL 3601182, at *48 (finding statement by decisionmaker that "he believed there were 'too many black supervisors and too many black people'" as employees was "plainly discriminatory").

Lastly, a court must also consider the context in which the remarks were made, "whether it was related to the decision-making process." *See Henry*, 616 F.3d at 149. In *Henry*, the Second Circuit held that even though "the 'tar baby' remark was allegedly made around the time that the incidents giving rise to [the plaintiff's] suit occurred," it was "not related to the decision-making process," and although "a reasonable juror might have found the remark offensive," "it is less clear that a reasonable juror would have found it indicative of discriminatory animus." *Id.* at 150; *see also Jowers v. Family Dollar Stores, Inc.*, No. 09-CV-2620, 2010 WL 3528978, at *3 (S.D.N.Y. Aug. 16, 2010) ("Only where decision-makers repeatedly make comments that draw a direct link between a plaintiff's membership in a protected class and an adverse employment action can an inference of discriminatory animus be drawn." (citation omitted)), *aff'd*, 455 F. App'x 100 (2d Cir. 2012).

Starrantino's comments are sufficiently probative to permit a rational fact-finder to conclude that discriminatory purpose was a motivating factor in the NYPD's enforcement

actions against Onyxx Lounge. As to the first factor, Starrantino's status as the ranking officer or "decision-maker," who made the decision to enter Onyxx Lounge on September 29, 2012, weighs in favor of finding his comments probative of animus.[40] (Defs. 56.1 ¶ 85; Pl. Resp. ¶ 85.) Although residents made 911 calls on September 29, 2012 complaining of "conditions" at Onyxx Lounge, a permissible reason to patrol the premises and conduct a search does not preclude a finding that Starrantino's decision was also motivated by discriminatory purpose. *See Raza*, 998 F. Supp. 2d at 79 ("[T]he existence of permissible motives does not preclude a finding that an impermissible discriminatory purpose was a factor in the government's actions." (citing cases)).

In addition, Starrantino's decision to enter Onyxx Lounge on September 29, 2012 had consequences for subsequent inspections. At his deposition, Lieutenant Calderon testified that on December 14, 2012, as "lead supervisor," (Calderon Dep. 173:5–18, annexed to Hoffman Decl. as Ex. E, Docket Entry No. 64-5), he decided to conduct a follow-up inspection on December 14, 2012 "based on a historical incident of that licensed premise," namely, the September 29, 2012 inspection initiated by Starrantino, (*id.* at 148:14–22). While there is no evidence that Calderon acted with impermissible motive, his decision is linked to events set in motion by Starrantino's previous decision to enter the lounge. Under the circumstances of this

---

[40] Although Starrantino made the decision to enter Onyxx Lounge on September 29, 2012, approximately three months before he made the derogatory remarks at the December 14, 2012 inspection of Onyxx Lounge, this does not dilute his remarks or render them any less probative. *See Terry v. Ashcroft*, 336 F.3d 128, 139 (2d Cir. 2003) ("While [the plaintiff] testified that these comments were made several years after [the position] had been filled, the weight to be given these comments is a matter for the jury, which could infer that age was a factor in promotion decisions at the [the place of employment]."); *Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 276 n.2 (E.D.N.Y. 2013) (in employment context, finding that a "comment made after the position in question had already been filled may still support an inference that the promotion decision was based on an unlawful motive" (citing *Terry*, 336 F.3d at 139)); *see also Johnson v. Maestri-Murrell Prop. Mgmt., LLC*, 487 F. App'x 134, 137 (5th Cir. 2012) (holding that the district court erred in disregarding discriminatory comments solely because the plaintiff failed to demonstrate that the remarks were made before the discriminatory act).

case, because of his decision to enter Onyxx Lounge on September 29, 2012, Starrantino also had an indirect influence on the subsequent decision to enter Onyxx Lounge on December 14, 2012.

The second factor cited in *Henry* also supports the conclusion that Starrantino's comments evince a discriminatory purpose. Starrantino's alleged comments shed a discriminatory light on the NYPD's enforcement actions, as they were allegedly made during the course of the December 14, 2012 inspection. *See Savino*, 983 F. Supp. 2d at 303 (finding a comment probative of discriminatory intent where the plaintiffs "proffered evidence that [the defendant] allegedly made the comment contemporaneously" with enforcement action (citations omitted)).

Undoubtedly, the content of Starrantino's alleged remarks — referring to Plaintiff as a "black b***h,'" threatening to "slap the sh*t out of [her] black a**," and telling her to "shut [her] black a** up before I lock you up" — are probative of racial bias. *See Martinez v. New York City Transit Auth.*, 672 F. App'x 68, 71 (2d Cir. 2016) ("Although stray remarks, without more, cannot defeat summary judgment . . . [the defendant's] alleged statement is less a 'stray' remark than an open declaration of bias." (citing *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998)); *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 81–82 (2d Cir. 2009) (in an employment discrimination case, reversing district court's grant of summary judgment to defendant where supervisor told plaintiff that he "deserved to be called a white mother f**k," and told the plaintiff that "white people are lazy" (internal quotation marks omitted)).

Finally, while the comments were made during an inspection of Onyxx Lounge, there is otherwise no apparent connection between these comments and the decision to inspect, or the

decision to issue summonses for the alleged observed A.B.C. Law violations, therefore, this factor does not weigh in favor of finding the comments probative of discriminatory motive. *See Henry*, 616 F.3d at 149.

As three of the four factors support a finding that the comments are probative of discriminatory intent, a rational juror could conclude that, based on Starrantino's alleged remarks, Plaintiff's race was a motivating factor in the NYPD's enforcement of the A.B.C. Law.[41] Plaintiff has therefore presented sufficient evidence to establish a material issue of fact as to her equal protection claim based on a theory of "discriminatory application of a facially neutral law." *See Janfeshan*, 2017 WL 3972461, at *10 (denying motion to dismiss equal protection claim where the plaintiff alleged U.S. Customs and Border Protection officers asked him "What kind of Muslim are you?" and if he was "a beginner, intermediate, or advanced level" Muslim, and related comments); *Antoine ex rel. Antoine v. Rucker*, No. 03-CV-3738, 2006 WL 1966649, at *9 (D.N.J. July 12, 2006) (finding that an officer's comment saying "I'll teach you *American* law" toward an individual of Haitian descent "could sustain the inference that the arrest, battery and illegal entry had a discriminatory animus as against [the plaintiff] and his family").

In addition, the Court declines to dismiss Plaintiff's equal protection claim against King and Starrantino for lack of personal involvement. Plaintiff's equal protection claim is based on the enforcement actions against Onyxx Lounge, Plaintiff, and her patrons. As to Starrantino, the evidence discussed *supra* is adequate to support his personal involvement in this conduct, in

---

[41] Although they contest it, Defendants fail to demonstrate that NYPD officers would have searched Onyxx Lounge and taken similar enforcement actions on September 29, 2012 and December 14, 2012, regardless of Plaintiff's race.

addition to the fact that he verified Plaintiff's arrest as supervising officer on patrol on September 29, 2012.[42]  *See Harris v. City of New York*, No. 15-CV-8456, 2017 WL 6501912, at *4 (S.D.N.Y. Dec. 15, 2017) (finding that "a supervising officer 'verifies' an arrest by concluding that the officers had probable cause to make the arrest" and "[i]n effect, . . . signs off on the arrest," making such officer a "direct participant" in it and liable for false arrest).  As to King, Defendants argue that there is no evidence he "had any racial animus toward [P]laintiff and thus personally committed an equal protection violation."  (Defs. Reply 14.)  However, there is no dispute that he was the officer on desk duty the night the officers arrested Plaintiff or that he verified her arrest when she was taken to the 110th Precinct.  *See Harris*, 2017 WL 6501912, at *4.  Moreover, a reasonable fact-finder could infer from Starrantino's comments that all officers who participated in the enforcement actions — including King — were "motivated at least in part" by race, *see City of Yonkers*, 96 F.3d at 612; Plaintiff is not required to present separate evidence as to each Defendant to sustain her claim, *see Sanders v. Garden City Police Dep't*, No. 09-CV-2393, 2015 WL 5518589, at *5 (E.D.N.Y. Sept. 16, 2015) ("[T]o the extent that defendants suggest that comments by one officer can never be used to infer racial animus by other officers allegedly involved in the same unconstitutional activity, the [c]ourt disagrees.").

Because there is sufficient evidence to permit a rational jury to conclude that Plaintiff's race and the race of her patrons were a motivating factor in the NYPD's enforcement actions, Defendants' motion to dismiss Plaintiff's equal protection claim based on a theory of

---

[42]  Defendants do not appear to dispute that Starrantino and King verified Plaintiff's arrest.  (*See* Defs. Reply 14 ("[T]here is simply no evidence that Sergeant Starrantino individually intended to racially discriminate against the plaintiff *when verifying her arrest on September 29, 2012* and thus personally committed an equal protection violation.  Nor is there any evidence that Captain King, *responsible for verifying plaintiff's arrest in his capacity as Desk Officer*, had any racial animus toward plaintiff and thus personally committed an equal protection violation." (emphasis added).)

discriminatory application of the law is denied.

### iv.    Qualified immunity

Finally, the Court cannot conclude that Defendants are entitled to qualified immunity for the enforcement actions against Onyxx Lounge and Plaintiff. Viewing the facts in a light most favorable to Plaintiff, reasonable officers would not disagree as to whether the alleged conduct — use of the A.B.C. Law to engage in intentional discrimination — would be lawful. *See Vill. of Freeport v. Barrella*, 814 F.3d 594, 609 (2d Cir. 2016) (in the Title VII context, rejecting the defendants' "rather incredibl[e] argument" that "it was 'objectively reasonable' for him to believe in 2010 that federal law did not forbid discrimination based on Hispanic ethnicity"); *Reynolds v. Barrett*, 741 F. Supp. 2d 416, 440 (W.D.N.Y. 2010) ("I see no basis for a qualified-immunity defense, which requires that the defendant believed, in good faith, that his actions did not violate the plaintiff's rights. Such a defense is incompatible with intentional discrimination, which is what is alleged here." (citation omitted)), *aff'd*, 685 F.3d 193 (2d Cir. 2012).

The Court therefore grants Defendants' motion for summary judgment to the extent Plaintiff asserts a theory of selective enforcement, but denies Defendants' motion to the extent Plaintiff asserts that Defendants applied a facially neutral law in a discriminatory manner.

### c.    Section 1983 — false arrest/false imprisonment claim

The parties cross-move for summary judgment as to Plaintiff's false arrest and false imprisonment claim against Larosa, Leguernic, Starrantino, King, Xerri, and Calderon.[43]

_____

[43]  Because Plaintiff pleads false arrest and false imprisonment as a single claim, and because "[f]alse arrest and false imprisonment are considered one tort," *Frederick v. City of New York*, No. 13-CV-897, 2016 WL 8711395, at *8 n.19 (E.D.N.Y. Mar. 25, 2016) (citing *Wallace v. Kato*, 549 U.S. 384, 388 (2007)), the Court addresses the issues of false arrest and false imprisonment together as one claim. *See also Hickey v. City of New York*, No. 01-CV-6506, 2004 WL 2724079, at *6 (S.D.N.Y. Nov. 29, 2004) ("[T]he claims of false arrest and false imprisonment are 'synonymous[.]'"), *aff'd*, 173 F. App'x 893 (2d Cir. 2006).

Plaintiff contends that Larosa arrested her on September 29, 2012 based "on his personal 'feelings and his inclinations'" instead of probable cause. (Pl. 56.1 ¶ 8; Pl. Mem. 8–15; Pl. Opp'n 20–21.) According to Plaintiff, viewing the facts in a light most favorable to Defendants, Larosa observed dice and money "resting on the table," but did not "observe[] [anyone] throwing dice, rolling dice, shaking dice or even moving dice." (Pl. Mem. 8–9, 12.) Plaintiff therefore argues that the evidence does not support the offenses for which the officers arrested her because the offenses "require[] facilitating or profiting from active gambling," and the record does not support a finding of probable cause. As to King and Starrantino, Plaintiff argues that they are liable "under [a] theory of supervisory liability, as they were involved in verifying the arrest either as the supervisor on the scene (Starrantino) or as the officer operating the desk [at the precinct] (King)." (Pl. Opp'n 21; *see also* Pl. Mem. 4 n.5.)

Defendants contend that they are entitled to summary judgment as to this claim because probable cause existed for Plaintiff's arrest,[44] (Defs. Mem. 12–15), or in the alternative, because they are entitled to qualified immunity, (Defs. Mem. 25–26; Defs. Reply 9; Defs. Opp'n 13–16). Defendants assert that when the officers entered the basement, "dice and sums of cash" were visible on the table, and Plaintiff's testimony to the contrary is "the epitome of self-serving statements." (Defs. Reply 8.) In addition, Defendants contend that Plaintiff's argument that an officer must observe players "actively gambling" to give rise to probable cause misrepresents the law. (*Id.*; Defs. Opp'n 7–13.) As to King and Starrantino, Defendants argue neither was personally involved in the alleged conduct giving rise to Plaintiff's false arrest claim and

---

[44] Defendants also argue that the NYPD officers had probable cause to issue summonses for the alleged violations observed at Onyxx Lounge on September 29, 2012 and December 14, 2012. (Defs. Mem. 14–15.) However, Plaintiff's claim is based only on her September 29, 2012 *arrest*. (*See* Am. Compl. ¶¶ 221–38.) The Court therefore declines to address these arguments.

therefore had no personal involvement, and, alternatively, they are entitled to qualified immunity. (*See* Defs. Mem. 13 n.8; Defs. Reply 13–14.)

The Fourth Amendment protects individuals from unreasonable searches and seizures by law enforcement officials. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). A law enforcement official violates the Fourth Amendment's protections if he or she arrests someone without probable cause. *Id.* Conversely, "probable cause is an absolute defense to a false arrest claim." *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (quoting *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 139 (2d Cir. 2010)). "A police officer has probable cause for an arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime . . . .'" *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (quoting *Weyant*, 101 F.3d at 852); *see also Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013). The reviewing court "must consider [only] those facts available to the officer at the time of the arrest and immediately before it." *Stansbury*, 721 F.3d at 89 (alteration in original) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). Probable cause need not be "predicated upon the offense invoked by the arresting officer, or even upon an offense 'closely related' to the offense invoked by the arresting officer." *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). A "plaintiff is not entitled to damages under [section] 1983 for false arrest so long as the arrest itself was supported by probable cause, regardless of whether probable cause supported any individual charge identified by the arresting officer at the time of arrest." *Id.* at 154. The question is whether the facts known to the arresting officer, at the time of the arrest, objectively support a finding of probable cause to support the arrest. *Gonzalez*, 728 F.3d at 155.

In addressing a section 1983 claim for false arrest, courts look to "the law of the state in which the arrest occurred" to determine if the officers had probable cause to arrest the plaintiff for a violation of state law. *Jaegly*, 439 F.3d at 152; *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19–21 (2d Cir. 2012) (analyzing whether the plaintiff's actions gave a police officer probable cause to arrest the plaintiff for violating state law). "Under New York law, 'to prevail on a claim of false arrest a plaintiff must show that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Nzegwu v. Friedman*, 605 F. App'x 27, 29 (2d Cir. 2015) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003)). "A [section] 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Gonzalez*, 728 F.3d at 155.

Section 225.05 of the New York Penal Law provides that "[a] person is guilty of promoting gambling in the second degree when he knowingly advances or profits from unlawful gambling activity." N.Y.P.L. § 225.05. An individual "advances . . . gambling activity" when, "acting other than as a player, he engages in conduct which materially aids any form of gambling activity." *Id.* § 225.00(4); *Gamoran v. Neuberger Berman Mgmt., LLC*, No. 10-CV-6234, 2010 WL 4537056, at *1 (S.D.N.Y. Nov. 8, 2010) (observing definition of "advanc[ing] gambling activity"). Such conduct, includes, *inter alia*, "conduct directed toward . . . the acquisition or maintenance of premises, paraphernalia, equipment or apparatus therefor . . . ." N.Y.P.L. § 225.00(4); *United States v. Fitzsimmons*, No. 02-CR-1066, 2003 WL 1571708, at *1 n.5 (S.D.N.Y. Mar. 26, 2003) (observing statutory list of conduct which "materially aids . . . gambling activity"), *aff'd sub nom. United States v. Offner*, 88 F. App'x 438 (2d Cir. 2004); *Dalton v. Pataki*, 5 N.Y.3d 243, 287 n.20 (2005) (same). In addition, "[o]ne advances gambling

activity when, having substantial proprietary or other authoritative control over premises being used with his knowledge for purposes of gambling activity, he permits such to occur or continue or makes no effort to prevent its occurrence or continuation." N.Y.P.L. § 225.00(4). An individual "profits from gambling activity" when, acting "other than as a player, he accepts or receives money or other property pursuant to an agreement or understanding with any person whereby he participates or is to participate in the proceeds of gambling activity." *Id.* § 225.00(5).

### i. Defendants' motion as to false arrest/false imprisonment

The Court denies Defendants' motion for summary judgment because Plaintiff's testimony creates a disputed issue of fact as to whether Larosa, upon entering the basement of Onyxx Lounge on September 29, 2012, observed money and dice on the table before arresting Plaintiff for gambling-related offenses.

At her deposition, Plaintiff testified that when she and Larosa entered the basement on September 29, 2012, no money or dice were visible on the table. (Glover Dep. 114–15, annexed to Marino Opp'n Decl. as Ex. 1, Docket Entry No. 76-1.) As to the existence of what Defendants claim is a "gambling table" in the basement of Onyxx Lounge, Plaintiff testified that the table was "[n]ot for anyone's use, but when the bar isn't open or I am just with my friends we go down and we would play on the table beer pong, poker downstairs and that was not for the public." (Glover Dep. 157:13–18, 160:9–22, annexed to Hoffman Decl. as Ex. B, Docket Entry No. 64-2.) Although Defendants request that the Court disregard this portion of Plaintiff's testimony as "self-serving," the Court declines to do so. *See Yang v. Navigators Grp., Inc.*, 674 F. App'x 13, 14–15 (2d Cir. 2016) ("[The plaintiff's] own testimony as to the communications at issue constituted admissible evidence and, thus, should not have been excluded from

consideration in reviewing defendant's summary judgment motion." (citing *Danzer*, 151 F.3d at

57)); *Sloane v. Getz*, 150 F. App'x 86, 88 (2d Cir. 2005) (vacating grant of unopposed motion for

summary judgment where the record contained deposition testimony creating a material issue of

disputed fact); *Danzer*, 151 F.3d at 57 (declining to hold allegations insufficient to survive

summary judgment merely because they were "self-serving"). Construing the facts in a light

most favorable to Plaintiff, the Court concludes that a rational jury could find, based on

Plaintiff's testimony, that the officers did not have probable cause to arrest Plaintiff on

September 29, 2012.[45]

---

[45] In arguing that the false arrest claim fails, Defendants do not explain why the officers had probable cause for criminal nuisance in the second degree. However, the Court nevertheless finds that, construing the facts in Plaintiff's favor, the officers did not have probable cause to arrest Plaintiff for criminal nuisance in the second degree. Under section 240.45 of the New York Penal Law, a person is guilty of criminal nuisance in the second degree when:

> 1. By conduct either unlawful in itself or unreasonable under all the circumstances, he knowingly or recklessly creates or maintains a condition which endangers the safety or health of a considerable number of persons; or
> 2. He knowingly conducts or maintains any premises, place or resort where persons gather for purposes of engaging in unlawful conduct.

N.Y.P.L. § 240.45. Larosa had no probable cause to arrest Plaintiff under section 240.45(1), because if, as Plaintiff testified, Larosa did not observe money or dice on the table upon entering the basement of Onyxx Lounge, there would be no basis to conclude that Plaintiff engaged in "unlawful" or "unreasonable" conduct. Nor do the facts suggest that Plaintiff "knowingly conduct[ed] or maintain[ed]" Onyxx Lounge as a place "where persons gather for purposes of engaging in unlawful conduct," and thus the facts do not give rise to probable cause under section 240.05(2) of the New York Penal Law.

Lastly, the officers did not have probable cause for possession of a gambling device in the second degree under section 225.30-2 of New York Penal Law, the third charge against Plaintiff. (*See* Charging Aff.; *see also* Arraignment Charges.) This offense requires a defendant to, among other things, "possess[] . . . [a]ny . . . gambling device, believing that the same is to be used in the advancement of unlawful gambling activity." N.Y.P.L § 225.30 (emphasis added). As an initial matter, the record does not indicate what "gambling device" Plaintiff was arrested for possessing. Assuming the gambling device in question was Plaintiff's table, the observation of that table, without the presence of money, dice, or other indications of illegal gambling, is insufficient for the officers to have concluded that Plaintiff "believ[ed] that the [table] is [being] used in the advancement of unlawful gambling activity." *Id.*

The Court also denies Defendants' motion to dismiss the claim as against Starrantino and King for lack of personal involvement. As discussed *supra*, both officers verified Plaintiff's arrest. Moreover, Defendants do not argue that the role of King and Starrantino in Plaintiff's arrest is insufficient to establish their personal involvement as to this claim.[46] (*See* Defs. Reply 13–14.) Defendants only argue that "because there was probable cause for [P]laintiff's arrest and no underlying constitutional violation occurred, no supervisory liability can attach." (*Id.* at 14.) However, because Defendants have not established that they are entitled to summary judgment as to Plaintiff's false arrest claim, the Court declines to dismiss the claims against King and Starrantino.

In addition, the Court cannot conclude that Defendants are entitled to qualified immunity for Plaintiff's arrest. Defendants' argument that they are entitled to qualified immunity inappropriately relies on disputed facts.[47] *See Loria v. Gorman*, 306 F.3d 1271, 1281 (2d Cir.

---

[46] In their reply brief, Defendants' discussion regarding King and Starrantino as they relate to Plaintiff's arrest is preceded by a header that reads "There is no evidence that Defendants King and Starrantino were 'personally involved' in any constitutional violation against Plaintiff." (Defs. Reply 13.) Defendants make two arguments in support of this assertion: (1) Plaintiff's equal protection claims against both King and Starrantino fail because neither Defendant possessed intent to racially discriminate against her; and (2) no supervisory liability can attach because Plaintiff's underlying false arrest claim fails. (*Id.*) Despite the mislabeled header, Defendants fail to explain why Plaintiff's claim as against King and Starrantino fails *for lack of personal involvement*. Moreover, the Court notes that at least one district court has concluded that an officer's "verification" of an arrest is sufficient to defeat a motion for summary judgment for lack of personal involvement. *See Harris v. City of New York*, No. 15-CV-8456, 2017 WL 6501912, at *4 (S.D.N.Y. Dec. 15, 2017) (discussing the process of "verifying" an arrest and concluding that "[the officer-defendant who did so] was a direct participant in the arrest and can be held liable for false arrest").

[47] Defendants argue that "[g]iven Officer Larosa's observation in the basement of [P]laintiff's Bar, of a group of people gathered around a 'gambling' table, with dice and large sums of cash on the table, it was objectively reasonable for Larosa to conclude the group was gambling, and/or reasonable officers could disagree." (Defs. Mem. 26; *see also* Defs. Opp'n 15.)

2002) (when determining whether officer is entitled to qualified immunity, the facts must be "taken in the light most favorable to the party asserting the injury"). Defendants do not point to any *undisputed* facts giving rise to probable cause. Viewing the record in a light most favorable to Plaintiff, who asserts that no dice or money were visible when Larosa entered the basement, it is far from clear that reasonable officers would disagree as to whether there was probable cause to arrest Plaintiff for the gambling-related offenses. *See Jefferson v. Reddish*, 718 F. App'x 94, 96 (2d Cir. 2018) ("Because a jury could reasonably find that defendants lacked probable cause or even arguable probable cause to arrest [the plaintiff] . . . genuine disputes of material fact preclude our determining as a matter of law whether defendants are entitled to qualified immunity.").

Accordingly, the Court denies Defendants' motion for summary judgment as to Plaintiff's false arrest and false imprisonment claim.

### ii. Plaintiff's motion as to her claim for false arrest/false imprisonment

The Court similarly denies Plaintiff's motion for summary judgment because, construing the facts in Defendants' favor, Larosa had probable cause to arrest Plaintiff. While Plaintiff "denies the existence of any dice and money" in the basement of Onyxx Lounge on September 29, 2012, she concedes that she must "assume[] PO Larosa's story is true for the purposes of [her] motion." (Pl. Mem. 3 n.3.) Larosa testified that upon entering the basement, he "observed a group of men with money in front of them on a table that was manufactured to be a gambling table[,] with dice on the table . . . ." (Larosa Dep. 172:2–7, annexed to Hoffman Decl. as Ex. H, Docket Entry No. 64-8.) The parties do not dispute that the table resembled one used for

gambling,[48] or that Plaintiff, who informed Larosa that "VIPs" were in the basement, appears to have known that the basement was occupied. (Defs. 56.1 ¶ 98.) These circumstances "are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime," *Swartz*, 704 F.3d at 111. Viewing the record in a light most favorable to Defendants, Larosa had probable cause to arrest Plaintiff for promoting gambling in the second degree. Plaintiff maintained the "premises, paraphernalia, [and] equipment" to engage in illegal gambling, "ha[d] substantial proprietary or other authoritative control" over the premises in which the gambling occurred, and despite her knowledge of such activity, "permit[tted] such to occur or continue or ma[de] no effort to prevent its occurrence or continuation."[49] N.Y.P.L. § 225.00(4).

---

[48] At Plaintiff's deposition, she testified that the table "was a folding casino poker table. It was leather, fox leather, black leather. It had green felt in it." (Glover Dep. 160:9–11, annexed to Hoffman Decl. as Ex. 2.)

[49] Plaintiff asserts that Starrantino, Calderon, and Larosa himself testified that "a police officer does not have probable cause to arrest for a gambling-related crime without observing gambling *actively transpiring*," (Pl. Opp'n 21 n.18), and that this testimony further supports her argument that Larosa did not have probable cause to arrest her, (*id.* at 20–21). Because the probable cause determination is an objective test, an officer's testimony regarding whether probable cause exists is not dispositive. *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006) ("The Supreme Court recently held that the probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest *objectively* provided probable cause to arrest." (emphasis added) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004))). Moreover, none of the officers testified that the presence of both dice and money are insufficient to give rise to probable cause. (*See* Larosa Dep. 172:14–18 (COUNSEL: "Does the fact that males are standing around a table that could be used for gambling, is that a violation of any law?" LAROSA: "No." COUNSEL: The fact that you have males standing around a table with dice on the table, does that, in and of itself, mean that they were violating any section of the Penal Law?" LAROSA: "No."), annexed to Hoffman Decl. as Ex. H, Docket Entry No. 64-8; Calderon Dep. 151:10–14 (COUNSEL: "Does the possession of the felt table in and of itself mean that there was promotion of gambling within the meaning of statute?" CALDERON: "No."), annexed to Marino Opp'n Decl. as Ex. 32, Docket Entry No. 76-32.) At Starrantino's deposition, the following exchange took place: COUNSEL: "It's a casino table, there's $10,000 in cash on the table. Do those two things in and of itself mean that there's gambling going on in the premises?"

Plaintiff's argument that probable cause for gambling-related offenses exists only when an officer observes the *exchange of* money or *movement* of dice is meritless and misunderstands the nature of probable cause, which requires knowledge or reasonably trustworthy information "sufficient to warrant a person of reasonable caution *in the belief*" that a crime has or is occurring. *Swartz*, 704 F.3d at 111 (citation omitted). Probable cause does not require, as Plaintiff appears to argue, observation of the crime itself.

To support her position, Plaintiff cites *People v. Jun Feng*, 946 N.Y.S.2d 68, 2012 WL 28563 (Kings Co. Crim. Ct. Jan. 4, 2012), where a New York state court granted a motion to dismiss a criminal information charging the possession of a gambling device, and denied the motion to dismiss a charge of promotion of gambling in the second degree. *Jun Feng*, 946 N.Y.S.2d at 68. Plaintiff argues that this decision "perfectly illustrates the requirement that an officer observe active gambling to have probable cause to arrest."[50] (Pl. Mem. 11.)

_____

STARRANTINO: "If you don't observe it, no." (Starrantino Dep. 124:22–125:12, annexed to Marino Opp'n Decl. as Ex. 6, Docket Entry No. 76-6.) Starrantino's response is, at best, ambiguous as to whether he believes the observation of gambling necessarily involves the "active" exchange of money and use of dice, or merely the *presence* of both money *and* dice. Construing this evidence against the moving party, the Court finds it inadequate to support Plaintiff's motion for summary judgment.

[50] In *Jun Feng*, an undercover officer entered a home and observed a group of people playing the Chinese game "Mah Jong." *Jun Feng*, 946 N.Y.S.2d 68, 2012 WL 28563, at *1. The officer received chips of cash value and was told that "one of the house rules was that whenever a player wins $15 or more in one hand, the house gets $1, which is placed in the house container." *Id.* The officer also observed two "video poker machines," the object of which is to "insert[] . . . bills into the machine and attempt[] to form a winning set of cards." *Id.* The defendants were charged under section 225.05 of the N.Y.P.L. with promoting gambling in the second degree, and under section 225.30 of the N.Y.P.L. with possession of a gambling device. *Id.* In declining to dismiss the charge for promoting gambling in the second degree, the court concluded that the defendants were engaged in gambling within the meaning of the law through use of the "house container," which "exhibited [their] 'understanding' that they would 'receive something in value in the event of a certain outcome' or a 'future contingent event' not under [their] 'control or influence,'" namely, the winner of the Mah Jong game. *Id.* at *4. The court

*Jun Feng* does not assist Plaintiff. The state court did not conclude that the officers were required to observe "active gambling" in order to give rise to probable cause for the promotion of gambling in the second degree; Plaintiff mistakenly relies on the court's discussion of the separate charge of possession of a gambling device. *See Greene v. Bryan*, No. 15-CV-249, 2018 WL 3539811, at *13–14 (E.D.N.Y. July 23, 2018) (rejecting argument that probable cause did not exist for crime of loitering for the purpose of gambling based on authority which "held that there was insufficient evidence to support probable cause for a different offense — possession of a gambling device"). In fact, *Jun Feng* appears to support the conclusion that there was probable cause to arrest Plaintiff, as the owner of Onyxx Lounge and someone therefore involved in the "maintenance of [the] premises" where the gambling activity occurred. *Jun Feng*, 946 N.Y.S.2d 68, 2012 WL 28563, at *5 (facts in indictment supported charge for promotion of gambling in the second degree by alleging that the defendants "advanced gambling activity" because indictment alleged "'conduct directed towards the creation or establishment of the particular game,' 'maintenance of premises,' and 'inducement of persons to participate therein'").[51]

---

also found that the indictment adequately alleged that the defendants "advanced gambling activity," as that phrase is defined by New York statute, because it stated that the defendants engaged in "'conduct directed towards the creation or establishment of the particular game,' 'maintenance of premises,' and 'inducement of persons to participate therein.'" *Id.* at *5. However, the state court dismissed the charge of possession of a gambling device, because the indictment did not allege, as the caselaw required, that the video poker machines operated by rewarding a player with "something of value in exchange for their play." *Id.* The court further observed that the defect in the indictment could not be cured because "no one was observed playing the machines." *Id.*

[51] Plaintiff cites to other decisions that are also distinguishable. Several of these decisions involve the dismissal of charges for failure to establish that the criminal defendant was "acting other than as a player" as required to adequately allege that the criminal defendant was "advancing gambling activity." *See, e.g., People v. Crespi*, 52 N.Y.S.3d 247, 2017 WL 177864, at *4 (Crim. Ct. Jan. 13, 2017) (probable cause did not exist where the circumstances did not suggest that the defendant was "acting other than as a player" as required to establish that he was

For the foregoing reasons, the Court denies Plaintiff's motion for summary judgment as to her false arrest/false imprisonment claim.

### iii. Lack of involvement of Xerri and Calderon

Although the Court denies both parties' motions for summary judgment as to Plaintiff's false arrest/false imprisonment claim, the record before the Court indicates that Plaintiff has not established that Defendants Xerri and Calderon were in any way involved in her arrest. The parties agree that Xerri was not present at Onyxx Lounge on September 29, 2012, as his first visit to Onyxx Lounge was on December 14, 2012. (Defs. 56.1 ¶ 116.) Calderon similarly testified — and Plaintiff does not dispute — that December 14, 2012 was the first time he had been to Onyxx Lounge. (Calderon Dep. 148:7–13, annexed to Hoffman Decl. as Ex. E, Docket Entry No. 64-5.) In addition, there is no other evidence connecting either Defendant to Plaintiff's arrest. The Court therefore dismisses the false arrest and false imprisonment claim against Xerri and Calderon.

---

"advancing gambling activity"); *People v. Rollins*, 4 N.Y.S.3d 443, 445 (App. Div. 2015) (no probable cause to arrest for possession of gambling device where "there was no evidence before the suppression court that defendant was anything more than a contestant or player in a game of dice" (first citing N.Y.P.L. §§ 225.00, 225.30(a)(2); and then citing *In re Victor M.*, 9 N.Y.3d 84, 87 (2007))). Construing the facts in Defendants' favor, the officers did not arrest Plaintiff under circumstances suggesting her role as a mere "contestant or player"; there is no dispute that Plaintiff was not a participant in the gambling activity that allegedly occurred on September 29, 2012. Rather, they arrested Plaintiff under circumstances suggesting that she *advanced gambling activity* as that term is defined *supra*.

The other cases Plaintiff cites do not support the argument that probable cause for promoting gambling in the second degree requires the observation of "active gambling." *See People v. Valentine*, 17 N.Y.2d 128, 132 (1966) (affirming conviction for gambling where officer observed conversations between participants and exchange of money); *People v. Wilder*, 834 N.Y.S.2d 92, 92 (App. Div. 2007) (probable cause existed for crime of loitering in a public place for the purpose of gambling); *People v. Mohammed*, 724 N.Y.S.2d 803 (Crim. Ct. Mar. 2, 2001) (dismissing criminal information because three-card monte is not a game of chance).

#### d. Section 1983 — illegal searches claim

Defendants move for summary judgment as to Plaintiff's claim for illegal searches based on the events which took place at Onyxx Lounge on August 24, 2012, August 27, 2012, September 29, 2012, December 14, 2012, and December 22, 2013.[52]  Defendants assert that all searches of Onyxx Lounge were lawful because, pursuant to the SLA regulatory scheme, "police officers are legally permitted to conduct warrantless business inspections of licensed premises whenever such establishments are open for business" and "with any amount of frequency." (Defs. Mem. 10–11.)  Defendants also assert that in addition to their authority to conduct warrantless searches, the officers had a variety of legitimate reasons to conduct inspections on the relevant dates.[53]

Plaintiff's briefing — both in opposition to Defendants' summary judgment motion and in support of her own motion — does not address the legality of the August 24, 2012, August 27, 2012, September 29, 2012, and December 14, 2012 searches.  (*See generally* Pl. Mem.; Pl. Opp'n 23–24.)  As to the December 22, 2013 search, Plaintiff argues that NYPD officers "shut

---

[52]  As discussed *infra*, Defendants dispute that the August 24, 2012 and December 22, 2013 searches occurred, contending that they "have only managed to locate documented evidence of three occasions" in which officers searched Onyxx Lounge, and therefore "maintain that the alleged entries on August 24, 2012 and December 22, 2013 did not occur."  (Defs. Mem. 9 n.6.)  The Court views the evidence in a light most favorable to Plaintiff and considers the evidence of all such searches below.

[53]  Defendants' briefing also addresses each search separately.  Defendants argue that: (1) they conducted a permissible search pursuant to the SLA's authority, and no notice or warrant was required for the August 27, 2012 visit, (Defs. Mem. 11); (2) the September 29, 2012 visit to Onyxx Lounge was legal because the NYPD officers' came to "investigate multiple civilian complaints," once there, they "observed enforceable violations outside," (*id.* at 11–12), and Plaintiff consented to the officers' entry and inspection; and (3) the December 14, 2012 inspection was proper because "it was known to them that the establishment had a problematic history due to the owner's recent arrest," and Calderon intended to "discern whether the documented violation had continued since September, and to determine whether the other violations summonsed at that time had been corrected," (*id.* at 12).

down" Onyxx Lounge "without issuing a summons, making an arrest, making a referral to another agency, or noting any danger to the public safety — all in contravention of NYPD policy." (Pl. Opp'n 24.)

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. "A search occurs when the Government acquires information by either 'physically intruding on persons, houses, papers, or effects,' or otherwise invading an area in which the individual has a reasonable expectation of privacy." *United States v. Ganias*, 755 F.3d 125, 133 (2d Cir. 2014) (citations omitted).

It is well-accepted that although the owner or operator of a business has a reasonable expectation of privacy in commercial property, this expectation is different from, and less than, a similar expectation in an individual's home. *New York v. Burger*, 482 U.S. 691, 699–700 (1987). "This expectation is particularly attenuated in commercial property employed in 'closely regulated' industries." *Id.* at 700. Given the diminished expectation of privacy of closely-regulated businesses, "a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment." *Id.* at 702; *see also In re Terrorist Bombings of U.S. Embassies in E. Africa,* 552 F.3d 157, 168 (2d Cir. 2008) ("Administrative searches, particularly those involving heavily regulated industries, may also be exempt from the warrant requirement under certain circumstances."). In *Burger*, a case involving the constitutionality of a New York Vehicle and Traffic Law permitting warrantless searches of junkyards, the Supreme Court established a three-part test to determine whether a warrantless search of a closely regulated industry is reasonable: (1) "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "warrantless

inspections must be necessary to further the regulatory scheme"; and (3) the administrative

scheme at issue "must provide a constitutionally adequate substitute for a warrant." *Burger,* 482

U.S. at 702–03; *Anobile v. Pelligrino*, 303 F.3d 107, 117–18 (2d Cir. 2002) (identifying the three

criteria established by the *Burger* court); *see also LeSueur–Richmond Slate Corp. v. Fehrer*, 666

F.3d 261, 264 (4th Cir. 2012) ("A statute permitting government agents to conduct warrantless

searches in the context of a heavily regulated industry is constitutional so long as it satisfies the

three-pronged test laid out by the U.S. Supreme Court . . . ." (citing *Burger*, 482 U.S. at 702)).

The third factor is satisfied if the regulatory statute advises "the owner of the commercial

premises that the search is being made pursuant to the law and has a properly defined scope, and

it . . . limit[s] the discretion of the inspecting officers." *Burger*, 482 U.S. at 703.

While Plaintiff alleges that NYPD officers inspected Onyxx Lounge without a "valid

warrant," (*see, e.g.,* Am. Compl. ¶ 243), Plaintiff's Fourth Amendment claim does not challenge

the A.B.C. Law itself, which, as she concedes, permits warrantless searches for licensed alcohol

retailers,[54] (Defs. 56.1 ¶ 46). The Court therefore understands Plaintiff to argue that the NYPD

officers violated her Fourth Amendments rights because the searches exceeded the permissible

bounds of the SLA's authority. *See Routhier v. Goggins*, 229 F. Supp. 3d 299, 304 (D. Vt. 2017)

("An administrative search under a scheme that meets [the *Burger*] criteria nonetheless can be

unreasonable under the Fourth Amendment if it exceeds its statutorily authorized scope." (first

citing *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 201 (5th Cir. 2009); and then citing *Bruce v.*

---

[54] At least one district court has considered the constitutionality of the A.B.C. Law and concluded that it satisfies the *Burger* test. *See United States v. Rivera*, No. 01-CR-866, 2001 WL 1568271, at *1 (S.D.N.Y. Dec. 7, 2001) ("The Supreme Court has outlined the criteria to be used in determining whether a state statute can be a basis for a warrantless inspection in a regulated industry without violating the Fourth Amendment. The New York liquor law satisfies these criteria and the inspection did not abridge Fourth Amendment rights." (citing *Burger*, 482 U.S. at 691, 702 (1987))).

*Beary*, 498 F.3d 1232, 1248 (11th Cir. 2007); and then citing *United States v. Knight*, 306 F.3d 534, 536 (8th Cir. 2002))); *see also Bruce*, 498 F.3d at 1244 ("Although a statute authorizing administrative searches may be constitutional, actual searches conducted under that authority may not.").

Under section 106(15) of the A.B.C. Law, "[a]ll retail licensed premises shall be subject to inspection by any peace officer, acting pursuant to his or her special duties, or police officer and by the duly authorized representatives of the liquor authority, during the hours when the said premises are open for the transaction of business." N.Y. Alco. Bev. Contr. Law § 106(15). During inspections, officers are permitted to check for violations of, *inter alia*, the A.B.C. Law, and examine the books and records of the licensee. *See Arnold's Wines, Inc. v. Boyle*, 571 F.3d 185, 188 (2d Cir. 2009) ("The State Liquor Authority may inspect any premises where alcoholic beverages are manufactured, stored, or sold, as well as the books and records kept on such premises." (citations omitted)); *Barski v. State Liquor Auth.*, 138 N.Y.S.2d 96, 97 (App. Div. 1955) ("The inspection of licensed premises authorized by Section 106, subdivision 15 of the Alcoholic Beverage Control Law, includes, in our opinion, all books and records loc ated upon the premises at the time of inspection.").

### i.        Searches prior to December 22, 2013

The Court grants Defendants' motion for summary judgment as to all searches prior to December 22, 2013, because Plaintiff has abandoned her claim as to these searches by not responding to Defendants' arguments. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); *Dunkin' Donuts Franchised Rests. LLC*, No. 07-CV-3662, 2009 WL 2997382, at *2 (E.D.N.Y.

Sept. 15, 2009) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (quoting *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003))).  In addition, based on the facts discussed *supra*, Plaintiff has not presented any evidence suggesting that any of the searches exceeded the scope of the SLA's authority or were otherwise unreasonable.[55]

### ii.      December 22, 2013 search

The Court also grants Defendants' motion for summary judgment as to the December 22, 2013 searches because Plaintiff has failed to raise any disputed issues of fact as to whether these

---

[55] Plaintiff's repeated assertions that the searches were "pretextual" or made "in bad faith" are insufficient to establish a violation of her Fourth Amendment rights.  Plaintiff relies on *City of Indianapolis v. Edmond*, 531 U.S. 32, 33 (2000), for the proposition that "subjective intentions . . . may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion."  (Pl. Opp'n 23–24.)  In *Edmond*, the Supreme Court struck down an Indianapolis law enforcement program consisting of drug interdiction vehicle checkpoints.  In its decision, the Supreme Court found the case controlled by its precedent forbidding checkpoint programs "whose primary purpose was to detect evidence of ordinary criminal wrongdoing."  *Edmond*, 531 U.S. at 41.  In so finding, the Supreme Court rejected an argument by the petitioners that "where the government articulates and pursues a legitimate interest for a suspicionless stop, courts should not look behind that interest to determine whether the government's 'primary purpose' is valid."  *Id.* at 45.  The Supreme Court clarified that "while 'subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis, *Whren* [*v. United States*, 517 U.S. 806 (1996),] does not preclude an inquiry into programmatic purpose in such contexts."  *Edmond*, 531 U.S. at 45 (citations omitted).

While the Supreme Court "caution[ed]," that "the purpose inquiry is to be conducted only at the programmatic level and is not an invitation to probe the minds of individual officers acting at the scene," *id.* at 48, the Second Circuit has interpreted *Edmond* to suggest that a specific administrative search conducted for the purpose of obtaining evidence of general criminal activity beyond what is authorized by law may violate the Fourth Amendment.  *See Anobile v. Pelligrino*, 303 F.3d 107, 122 (2d Cir. 2002).  However, although as discussed *supra*, Plaintiff has presented evidence supporting her claim that race was a motivating factor in the officers' decisions to enter Onyxx Lounge and conduct administrative searches pursuant to the SLA's authority, there is no evidence to support the claim that officers intended to conduct searches for general criminal activity exceeding such authority, nor is there evidence that they in fact did so.

searches violated her Fourth Amendment right to be free from unreasonable search.

Plaintiff testified that on December 22, 2013, the officers entered Onyxx Lounge, failed to adhere to the NYPD's training protocol for business inspections, demanded that the lights be turned on and the music turned off, and intimidated patrons, (*see* Pl. Statement of Additional Material Facts ¶¶ 259–68 (citing testimony)), which conduct was "in contravention of NYPD policy," (Pl. Opp'n 24).

Plaintiff argues, in essence, that NYPD officers shut down Onyxx Lounge without adequate justification, in violation of NYPD training. However, Plaintiff does not assert that the conduct exceeded the scope of the SLA's statutory authority. Even assuming the officers violated the NYPD's training, this alone cannot alone give rise to a section 1983 claim. *See Cimino v. Glaze*, 490 F. App'x 401, 403 (2d Cir. 2013) (affirming district court's jury instruction "that [the jury] was not to consider [an] internal police report finding that the defendants violated a police regulation as requiring a finding that they violated [the plaintiff's] constitutional rights" (citing *Doe v. Connecticut Dep't of Child & Youth Serv.*, 911 F.2d 868, 869 (2d Cir. 1990))); *Cox v. Vill. of Pleasantville*, 271 F. Supp. 3d 591, 600 (S.D.N.Y. 2017) ("As far as the Court is aware, and as far as Plaintiff has argued, there is nothing illegal or constitutionally impermissible about failing to comply with department policy. Internal policy may very well go above-and-beyond the bare-minimum requirements imposed by law, and a police officer is not more or less liable based on his or her compliance with departmental policy." (citing *Young v. Cty. of Fulton*, 160 F.3d 899, 902 (2d Cir. 1998)). [56]

---

[56] In her only reference to legal authority, Plaintiff cites *Federal Deposit Insurance Corporation v. Mallen*, 486 U.S. 230 (1988), a decision involving a substantive due process claim, to argue that "interest in continued employment is without doubt an important interest that ought not be interrupted without substantial justification." *Id. at* 243. However, assuming this

For the foregoing reasons, the Court grants Defendants' motion for summary judgment as to all of Plaintiff's section 1983 claims for all illegal searches.[57]

### e. Section 1983 — illegal seizure claim

Plaintiff bases her claim for illegal seizure on (1) the confiscation of her firearms and suspension of her firearm license, and the September 29, 2012 (2) alleged theft of $5000, and (3) property damage to Onyxx Lounge, including "the damage inflicted upon the wall by the bar, [a] broken door, damaged cabinets," and broken legs on a table. (Pl. Opp'n 22–23.) Plaintiff argues that the damage constitutes "more than ordinary disarray and damage incident to the execution of the warrant or search occurred." (*Id.*)

Defendants argue that Plaintiff's section 1983 illegal seizure claim fails because (1) Plaintiff's firearms and firearm license were seized "pursuant to valid law,"[58] (2) there is no evidence that Starrantino took $5000 from Onyxx Lounge on September 29, 2012, and (3) Plaintiff's property damage is "minor" and does not give rise to a Fourth Amendment violation.

---

principle applies with equal force in this context, Plaintiff has failed to show how this interruption violated her Fourth Amendment rights.

[57] Because the Court dismisses Plaintiff's claim for illegal searches, the Court also dismisses her failure to intervene claim based on the same conduct.

[58] Plaintiff does not dispute that, pursuant to Title 38 of the Rules of the City of New York, gun owners are required to "make an immediate report" to the NYPD Pistol Licensing Division of, *inter alia*, an "[a]rrest, indictment, or conviction in any jurisdiction," and that she failed to do so after her arrest. (Defs. 56.1 ¶¶ 132–33; Pl. Resp. ¶¶ 132–33.) Moreover, Plaintiff did not respond to Defendants' argument that the confiscation of her firearm and suspension of her firearm license were proper and therefore do not constitute a violation of her Fourth Amendment rights. Because Plaintiff failed to respond to this argument, Plaintiff has abandoned this theory of her seizure claim. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."). The Court therefore grants Defendants' motion for summary judgment as to Plaintiff's seizure claim based on the suspension of her firearm license and confiscation of her weapons, and grants Defendants' motion as to Plaintiff's failure to intervene claim based on the same conduct.

(Defs. Mem. 16–18.)

"A seizure occurs when there is some meaningful interference with an individual's possessory interest in that property." *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 185 (2d Cir. 2004) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). "Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits not subject to suppression." *Jackson ex rel. Jackson v. Suffolk Cty.*, 87 F. Supp. 3d 386, 401 (E.D.N.Y. 2015) (quoting *Ochoa v. City of W. Haven,* No. 08-CV-00024, 2011 WL 3267705, at *6 (D. Conn. July 29, 2011))). To state a claim, "[t]he plaintiff must establish 'that the officers' actions were unreasonable or malicious, and that more than ordinary disarray and damage incident to the execution of the warrant' or search occurred." *Id.* (first quoting *Kirkland v. City of New York,* No. 06 CV 0331, 2007 WL 1541367, at *7 (E.D.N.Y. May 25, 2007); and then citing *Cody v. Mello,* 59 F.3d 13, 16 (2d Cir.1995); and then citing *Bender v. Alvarez*, No. 06-CV-3378, 2009 WL 112716, at *7 (E.D.N.Y Jan. 16, 2009))). For the reasons discussed below, the Court grants in part and denies in part Defendants' motion as to Plaintiff's seizure claims.

### i. Property damage and removal

#### 1. Property damage

Plaintiff contends that on September 29, 2012, NYPD officers damaged her wall, broke her door, damaged her cabinets and broke the legs of her table. (Pl. Opp'n 22.) However, Plaintiff did not testify to any such damage, and there is no evidence to support her unlawful seizure claim for property damage. Moreover, the evidence Plaintiff relies on does not indicate any damage to Plaintiff's property. Plaintiff presents photographs of her business licenses hanging in Onyxx Lounge "before an officer ripped" such licenses off the wall, (*see* Marino

Opp'n Decl. ¶¶ 26–27; *see also* Photographs, annexed to Marino Opp'n Decl. as Exs. 23–24), and a "picture of the exit door swinging out at Onyxx Lounge on September 29, 2012," (Marino Opp'n Decl. ¶ 31; *see also* Photo, annexed to Marino Opp'n Decl. as Ex. 28, Docket Entry No. 76-28). Neither reflect any damage. As to Plaintiff's table, which she alleges the officers broke, there is no evidence to support this claim.[59] Finally, while Plaintiff asserts that the September 29, 2012 incidents resulted in "damaged cabinets" in Onyxx Lounge, the Court cannot discern any damage from the photograph in the record. (*See* Photograph, annexed to Marino Opp'n Decl. as Ex. 29.) To the extent this image reflects any damage, it constitutes "minor damage" that does not give rise to a Fourth Amendment violation. *See Kirkland v. City of New York*, No. 06-CV-0331, 2007 WL 1541367, at *7 (E.D.N.Y. May 25, 2007) ("The extent of the damage that plaintiff claims occurred during the search is limited to damage to an antique table, the front door, door frame, and the wall near the door. Plaintiff has failed to allege that such damage is anything more than ordinary disarray incident to the execution of the warrant, or that the officers' actions were malicious or unreasonable, given their reliance upon a valid search warrant."); *see also Hodge v. Vill. of Southampton*, 838 F. Supp. 2d 67, 84 (E.D.N.Y. 2012) (granting summary judgment where the plaintiff "produced evidence of only minimal damage to his van, through his testimony that he needed to replace an ashtray and glue down portions of the rug").

Accordingly, the Court grants Defendants' motion to the extent Plaintiff's claim rests on allegations of property damage.

---

[59] Plaintiff's counsel initially submitted a declaration and evidence in opposition to Defendants' motion, which evidence included a photograph purporting to demonstrate the damage to the table. (*See* Original Marino Opp'n Decl. ¶ 32, Docket Entry No. 75.) Plaintiff's counsel then submitted an amended declaration withdrawing this evidence "after realizing that Defendants did not produce the picture [of the table] referenced in my first declaration." (*See* Amended Marino Opp'n Decl. ¶ 2.) The photograph is therefore not part of the record. (*See id.* ¶ 33.)

## 2. Property removal

The Court finds that there are material disputed issues of fact as to whether NYPD officers took money from Onyxx Lounge on September 29, 2012 without providing a property voucher. Summary judgment on Plaintiff's claims for illegal seizure based on property removal is therefore inappropriate.

As an initial matter, contrary to Defendants' argument that Plaintiff's opposition brief "raises the allegation . . . for the first time in this litigation," (Defs. Reply 12 n.13), the allegation is contained in the Amended Complaint, (*see* Am. Compl. ¶¶ 118, 284). In addition, there is evidence supporting Plaintiff's claim. The report generated in connection with Plaintiff's complaints to IAB reflect that Plaintiff told IAB that she observed an unidentified officer "carrying a box that contained the missing currency." (IAB Investigation Findings 2.) Plaintiff also submitted photocopied pages of a journal in opposition to Defendants' motion. (*See* Journal Entries, annexed to Marino Opp'n Decl. as Ex. 21, Docket Entry No. 76-21.) Plaintiff asserts that at some point prior to August of 2012, she began using the journal to record incidents of alleged police harassment. (*See* Pl. Opp'n 6; Pl. Statement of Additional Material Facts ¶ 181.) The final photocopied page reads, in pertinent part: "Sept 28–29. Arrested twice. Money stolen. Business destroyed." (Journal Entries.)

Plaintiff's testimony as to her observations on September 29, 2012 is admissible evidence

sufficient to create a genuine issue of material fact[60] as to whether the officers[61] present that night improperly removed funds from Onyx Lounge without providing Plaintiff a voucher. Moreover, the Court declines to dismiss Plaintiff's claim on the basis of qualified immunity, as reasonable officers would not disagree over whether they would be permitted to, as Plaintiff essentially alleges, steal money from Onyxx Lounge.

For the foregoing reasons, the Court denies both parties' motion for summary judgment as to Plaintiff's seizure claims based on the alleged removal of funds from Onyxx Lounge.

### ii. Dismissal of certain Defendants

Because the Court has dismissed Plaintiff's claim for Fourth Amendment illegal seizure, to the extent it relates to the suspension of her firearm license and confiscation of her firearms, the Court dismisses this claim as against Defendants Lunetta and Brewster, both personnel

---

[60] The fact that the record does not contain such testimony does not mean that no genuine issue of material fact exists, as there is no reason to suggest Plaintiff could not testify to these facts at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."); *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."); *Perpall v. Pavetek Corp.*, No. 12-CV-0336, 2017 WL 1155764, at *9 (E.D.N.Y. Mar. 27, 2017) ("Here, there is nothing to suggest that Defendants would not be able to obtain for trial the necessary authenticating testimony or FRE 902(11) certification to satisfy FRE 803(6)."); *Parks v. Blanchette*, 144 F. Supp. 3d 282, 293 (D. Conn. 2015) ("[E]ven inadmissible evidence may properly be considered on summary judgment if it may reasonably be reduced to admissible form at trial.").

[61] While Plaintiff now asserts in her briefing that Starrantino was the officer who removed the funds, (*see* Pl. Opp'n 12–13), the evidence discussed *supra* does not specifically identify him as the officer who did so. However, as there is no dispute that Starrantino was one of five officers present at Onyxx Lounge on September 29, 2012, this is sufficient circumstantial evidence from which a reasonably jury could find his personal involvement in the alleged seizure. *See Medina v. Donaldson*, No. 10-CV-5922, 2014 WL 1010951, at *7 (E.D.N.Y. Mar. 14, 2014) (collecting cases in which circumstantial evidence supported personal involvement of officers present); *cf. Kennedy v. Arias*, No. 12-CV-4166, 2017 WL 2895901, at *11 (S.D.N.Y. July 5, 2017) (insufficient circumstantial evidence where there was not, *inter alia*, "a limited number of police officers present" where the incident took place).

within the NYPD's Pistol Licensing Division, who were not involved in any other conduct relevant to Plaintiff's seizure claim.

### f. Section 1983 — failure to intervene claim

Plaintiff argues that Defendants are liable for their failure to intervene against the violation of Plaintiff's rights during her arrest on September 29, 2012. (Am. Compl. ¶¶ 289–302.)

Defendants argue that Plaintiff's claim fails because Plaintiff has failed to establish a constitutional violation. (Defs. Mem. 21–22.) In the alternative, Defendants argue that they are entitled to qualified immunity for any failure to intervene because "a reasonable fellow officer would not have detected any potential constitutional violations." (*Id.* at 26.) Plaintiff does not respond to either argument. (*See generally* Pl. Opp'n.)

"[L]aw enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir. 1994) (collecting cases)). An officer may be liable for the preventable harm caused by the officer's failure to intervene during a constitutional violation where the officer "observes the [constitutional violation] and has sufficient time to act to prevent it." *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (citation omitted); *see also Terebesi*, 764 F.3d at 244. However, "[a]n underlying constitutional violation is an essential element of a failure to intercede claim under [section] 1983." *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 566 (S.D.N.Y. 2010) (citing *Ricciuti*, 124 F.3d at 129); *see also Wieder v. City of New York*, 569 F. App'x 28, 30 (2d Cir. 2014) ("Because the underlying constitutional claims were properly dismissed, we also affirm the district court's dismissal of plaintiff's failure to intervene claim.");

*Levy v. City of New York*, 935 F. Supp. 2d 575, 594 (E.D.N.Y. 2013) ("[T]he failure to intervene claim is contingent upon the disposition of the primary claims underlying [it]." (quoting *Matthews v. City of New York*, 889 F. Supp. 2d 418, 443–44 (E.D.N.Y. 2012))).

Because the Court denies Defendants' motion as to Plaintiff's false arrest claim, the Court accordingly denies Defendants' motion for summary judgment as to Plaintiff's failure to intervene claim as it relates to that claim. Moreover, for the reasons discussed above, Defendants are not entitled to qualified immunity for any constitutional violations arising from Plaintiff's false arrest/false imprisonment.

In addition, the Court dismisses Plaintiff's failure to intervene claims against Defendants Shafidiya, Xerri, Calderon, Lunetta, and Brewster. Plaintiff's remaining failure to intervene claim relates solely to Plaintiff's arrest on September 29, 2012. Shafidiya, Xerri and Calderon were not present the night of Plaintiff's arrest or otherwise involved in it. Lunetta and Brewster, employees of the NYPD's Pistol Licensing Division, similarly had no involvement in Plaintiff's arrest.

### g. Section 1983 —municipal liability claim

Defendants argue that the lack of an underlying constitutional violation is fatal to Plaintiff's section 1983 *Monell* claim. In addition, Defendants argue that Plaintiff has not demonstrated the existence of a "City policy or custom," (Defs. Mem. 24), and that Plaintiff's new *Monell* theory — that the NYPD illegally instructs its officers to issue summonses for noise complaints without the use of a sound meter — is improperly raised for the first time in opposition to Defendants' motion, (Defs. Reply 15).

Plaintiff concedes that she did not plead a *Monell* claim based on this practice in the

Amended Complaint,[62] but "requests that the Court entertain this claim" because Defendants cannot establish prejudice. (Pl. Opp'n 25.)

In order to assert a section 1983 claim against municipal defendants such as the City of New York, a plaintiff must demonstrate that "(1) an official [municipal] policy or custom that (2) cause[d] the plaintiff to be subjected to (3) a denial of a constitutional right." *Torraco*, 615 F.3d at 140 (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)); *Douglas v. City of New York*, 730 F. App'x 12, 18 (2d Cir. 2018) (same). A plaintiff can establish an official policy or custom by showing any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff and others encountering those subordinates. *See Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13–14 (2d Cir. 2015) (formal policy officially endorsed by the municipality); *Matusick v. Erie County Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (widespread and persistent practice); *Carter v. Inc. Vill. of Ocean Beach*, 759 F.3d 159, 164 (2d Cir. 2014) (failure to train amounting to deliberate indifference); *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012) (policymaking official's "express" or "tacit" ratification of low-level employee's actions).

The Court finds that Plaintiff has abandoned her original *Monell* theory. Plaintiff failed

---

[62] As discussed *supra*, the Amended Complaint alleges an unlawful municipal policy based on the NYPD Pistol Licensing Division's asserted practice of "cancelling" gun permits and licenses "for ex-NYPD officers with whom NYPD officials are disgruntled." (Am. Compl. ¶¶ 303–13.)

to respond to Defendants' argument that she has not presented sufficient evidence to support her claim; indeed, Plaintiff's opposition brief makes no mention of her current *Monell* claim. (*See generally* Pl. Opp'n.) Plaintiff's briefing instead focuses entirely on her request that the Court consider her new proposed *Monell* theory. (*See id.* at 24–26); *see also Jackson*, 766 F.3d at 198 ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."). The Court therefore grants Defendants' motion for summary judgment as to Plaintiff's current *Monell* claim and addresses Plaintiff's motion to amend her pleadings to add a new *Monell* claim below.

### h. Motion to amend

Plaintiff seeks leave to file a second amended complaint adding a *Monell* claim challenging the NYPD's practice of "issu[ing] summonses for unreasonable noise in a commercial establishment without a sound meter." (Pl. Mot. to Amend 1.) Plaintiff argues that section 24-218 and 24-231 of New York City's Administrative Code "are the applicable statutes and require sound meter readings at commercial establishments." (*Id.* at 2.) In addition, Plaintiff argues that the City permits the issuance of unreasonable noise summonses without the use of sound meters, and is therefore "subject to municipal liability for instructing its officers to enforce the law in a manner contrary to the applicable statutes (and their own training)." (Pl. Opp'n 24.)

Defendants raise several arguments in opposition to Plaintiff's motion, including Plaintiff's alleged "inordinate and inexcusable" delay in seeking amendment, attempt to use her motion to amend as a means to evade summary judgment, the asserted prejudice Defendants would suffer if amendment were permitted, and the futility of such amendment. (Defs. Opp'n to Pl. Mot. to Amend, Docket Entry No. 88; *see also* Defs. Letter dated Jan. 12, 2018, Docket Entry No. 92.)

"An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to [Rule] 12(b)(6)." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002); *see also Majad ex rel. Nokia Ret. Sav. & Inv. Plan v. Nokia, Inc.*, 528 F. App'x 52, 54 (2d Cir. 2013) ("Because the denial of leave to amend in this case was based on futility, we consider whether the proposed complaint's allegations are sufficient to withstand a Fed. R. Civ. P. 12(b)(6) motion to dismiss."), *as amended* (June 25, 2013). Notwithstanding this well-settled principle, the Second Circuit has stated that "the rule is different where . . . the cross-motion is made in response to a [Rule 56] motion for summary judgment, and the parties have fully briefed the issue whether the proposed amended complaint could raise a genuine issue of fact and have presented all relevant evidence in support of their positions." *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001). In such instances, even if the amendment could withstand a 12(b)(6) motion, "the court may deny the amendment as futile when the evidence in support of the plaintiff's proposed new claim creates no triable issue of fact and the defendant would be entitled to judgment as a matter of law under Fed. R. Civ. P. 56(c)." *Id.*; *see also Merrick Bank Corp. v. Chartis Specialty Ins. Co.*, No. 12-CV-7315, 2015 WL 4126780, at *1 (S.D.N.Y. July 7, 2015) ("Although an assertion of futility is normally assessed under the standard for a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), where the motion to amend is made at a late stage and the Court 'has the full evidentiary record at its disposal, a summary judgment standard will be applied.'" (quoting *Summit Health. Inc. v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 404 (S.D.N.Y. 2014))).

Plaintiff's amendment, even if it is assessed under a Rule 12(b)(6) standard, would be futile. In essence, Plaintiff's proposed section 1983 claim rests on the NYPD's alleged non-compliance with New York City's Administrative Code. (*See* Pl. Mot. to Amend 2 ("The

applicable statutes, training materials, and a decision from at least one court indicate that New York City's Administrative Code ('AC') §§ 24-218 and 24-231 are the applicable statutes and require sound meter readings at commercial establishments, such as a lounge." (citing AC§§ 24-218 and 24-231)); Pl. Opp'n 24 (arguing that the City is "subject to municipal liability for instructing its officers to enforce the law in a manner contrary to the applicable statutes (and their own training)"). However, as is the case with violations of training and internal policy discussed above, it is well established that a failure to comply with state law cannot in and of itself form the basis of a section 1983 claim. *See Walker v. City of New York*, 621 F. App'x 74, 76 n.1 (2d Cir. 2015) ("A bare assertion that Defendants failed to comply with state law, even if true, is insufficient to sustain a § 1983 claim." (citing *Young*, 160 F.3d at 902)); *Rebenstorf v. City of New York*, No. 15-CV-5784, 2015 WL 6438765, at *4 (E.D.N.Y. Oct. 21, 2015) ("Plaintiff alleges that the strip searched violated a [Department of Corrections] Directive requiring strip searches to take place in an area providing privacy. However, a violation of a DOC regulation does not, in and of itself, constitute a violation of a federal right." (first citing *Simmons v. Cripps*, No. 12-CV-1061, 2013 WL 1290268, at *21 (E.D.N.Y. Feb. 15, 2013); and then citing *Doe*, 911 F.2d at 869)); *Hyman v. Holder*, No. 96-CV-7748, 2001 WL 262665, at *6 (S.D.N.Y. Mar. 15, 2001) ("Section 1983 imposes liability for violations of rights protected by the Constitution and laws of the United States, not for violations arising solely out of state or common-law principles." (first citing *Fluent v. Salamanca Indian Lease Auth.,* 847 F. Supp. 1046, 1056 (W.D.N.Y.1994)); and then citing *Doe*, 911 F.2d at 869)); *cf. Patterson v. Coughlin*, 761 F.2d 886, 891 (2d Cir. 1985) (a violation of state regulation can form the basis of a section 1983 claim if the state regulation "merely reiterated what already was *required* by the Constitution" (citing *Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985))).

Plaintiff's argument relies on caselaw that is inapposite. Plaintiff asserts that the City's "official policy resulted in the denial of [her] Fourth Amendment rights, as acknowledged by this Court, as she was a criminal defendant who hired a lawyer and made nine court appearances after an initial release on her own recognizance." (Pl. Mot. to Amend 3 (first citing *Evans v. City of New York*, 2015 WL 1345374 at *6–7 & n.8 (E.D.N.Y. May 25, 2015); and then citing *Swartz*, 704 F.3d at 112).) However, as the context of Plaintiff's citations make clear, both *Evans* and *Swartz* involved claims of malicious prosecution, not municipal liability.[63] Plaintiff makes no other argument as to why the City's policy violates her federal constitutional or statutory rights. Accordingly, her proposed section 1983 claim fails on the merits and is therefore futile.

### III. Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment as to Plaintiff's claims for (1) Title VII employment retaliation; (2) violation of the Fourteenth Amendment's equal protection clause, to the extent it rests on a theory of selective enforcement; (3) Fourth Amendment illegal searches; (4) Fourth Amendment illegal seizures, to the extent it relates to (a) the suspension of Plaintiff's firearm license and confiscation of her firearms, (b) the "shutting down" of Onyxx Lounge on December 14, 2013 and December 22, 2013, and (c) the alleged damage to Onyxx Lounge during the night of Plaintiff's arrest; (5) failure to intervene, to the extent it relates to (a) the alleged illegal searches, and (b) the suspension of Plaintiff's firearm license and confiscation of her firearms; and (6) municipal liability pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). The Court dismisses Defendants the City of New York, Lunetta and Brewster from the action.

---

[63] The plaintiff in *Evans* withdrew that claim of municipal liability before the Court issued its decision. *See Evans v. City of New York*, No. 12-CV-5341, 2015 WL 1345374, at *1 (E.D.N.Y. Mar. 25, 2015).

The Court denies (1) Defendants' motion for summary judgment as to Plaintiff's claims for (a) false arrest/false imprisonment; (b) violation of the Fourteenth Amendment's equal protection clause, to the extent it rests on a theory of discriminatory application of the law; (c) Fourth Amendment illegal seizures, to the extent it relates to the alleged theft of funds from Onyxx Lounge the night of Plaintiff's arrest; (d) failure to intervene, to the extent it relates to Plaintiff's alleged false arrest/false imprisonment; (2) Plaintiff's motion for partial summary judgment, and (3) Plaintiff's motion to amend her pleadings.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated:  October 9, 2018
          Brooklyn, New York